UNITED STATES of America, Appellee,

v.

Jason Brion ANGIULO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John Carmen CINCOTTI,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William Joseph KAZONIS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John Carmen CINCOTTI, William Joseph Kazonis, Jason Brion Angiulo,
Defendants, Appellants.

Nos. 86–1965, 86–2000, 86–2017
and 87–1745.

United States Court of Appeals,
First Circuit.

Heard Dec. 10, 1987.

Decided May 24, 1988.

Rehearing and Rehearing En Banc
Denied in Nos. 86–1965 and
86–2017 July 6, 1988.

958

Robert L. Sheketoff, Boston, Mass., with whom Kimberly Homan and Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., were on brief, for defendant, appellant Jason Brion Angiulo.

Carolyn M. Conway with whom Francis J. DiMento and DiMento & Sullivan, Boston, Mass., were on brief, for defendant, appellant William Joseph Kazonis.

Willie J. Davis with whom Davis, Robinson & Smith, Boston, Mass., was on brief, for defendant, appellant John Carmen Cincotti.

Frank J. Marine, U.S. Dept. of Justice, Washington, D.C., with whom Frank L. McNamara, Jr., U.S. Atty., Robert S. Mueller, III, Acting U.S. Atty., Jeremiah T. O'Sullivan, Jeffrey Auerhahn and John Voorhees, Sp. Attys., U.S. Dept. of Justice, Washington, D.C., were on briefs for appellee.

Before COFFIN, BREYER and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

These are consolidated appeals from convictions on jury verdicts rendered after 58 days of trial. The defendants, Jason Angiulo, William Kazonis, and John Cincotti, were connected with the Patriarca Family of La Cosa Nostra, which has developed a reputation in United States law enforcement circles for highly organized criminal activities. Defendant Angiulo was convicted of participating in illegal gambling (18 U.S.C. § 1955); Kazonis was convicted of conspiring to obstruct and obstructing justice (18 U.S.C. §§ 371, 1503); and Cincotti

1. Gennaro Angiulo was separately convicted for

was convicted of conspiring to participate and participating in an enterprise through a pattern of racketeering or collection of an unlawful debt (18 U.S.C. § 1962(d) and (c), respectively) and participating in an illegal gambling business (18 U.S.C. § 1955). We briefly describe the essential facts pertaining to these convictions and then discuss the issues raised by defendants on appeal.

I.

The bulk of evidence admitted against the defendants was the product of lengthy electronic surveillance, both audio and video, conducted in 1981 at 98 Prince Street in Boston, the headquarters for operations of Gennaro Angiulo, father of defendant Jason Angiulo and a known "underboss" of the Patriarca Family,[1] and at 51 North Margin Street, Boston, the site of certain high-stakes poker games, with which defendant Cincotti had certain affiliations. Numerous search warrants executed by FBI agents in 1981 produced physical evidence that was introduced against Cincotti.

From this and other evidence introduced at trial, the jury would have been warranted in finding the following facts pertaining to each defendant:

*John Cincotti*

In 1980 and 1981, Cincotti and other individuals operated high-stakes poker games at 51 North Margin Street, Boston. Cincotti managed these games and extended credit to players. Chips were provided at $500 each to the players. Electronic surveillance conducted at one of these games revealed that betting reached a sum of over $10,000. Cincotti kept a list of the gambling debts owed by each player for each game. After a night of gambling, Cincotti would "settle accounts" with the players and negotiate further extensions of credit and terms of payment.

The gambling business at 51 North Margin Street was "owned" by a partnership that included Gennaro Angiulo and Ilario

crimes involving the alleged conspiracies at is-

Zannino, among others.[2] A recorded conversation between these two men, introduced at trial, revealed that Cincotti was responsible for keeping track of the profits earned by the gambling operation. On May 18, 1981, pursuant to authorized search warrants, FBI agents entered 51 North Margin Street while poker games were in progress and seized gambling paraphernalia. Searching Cincotti, they found on his person $9500 in cash and slips of paper containing the names of individuals owing debts from poker games that totalled over $56,000. The agents also found on a table next to Cincotti a spiral notebook containing names of players to whom credit had been extended that evening.

Tape recordings of conversations at 51 North Margin Street, not directly related to the gambling operation, revealed Cincotti's participation in a plot to murder one Harvey Cohen, the owner of an air freight business that operated in competition with a similar business run by the Patriarca Family. The recordings also revealed Cincotti's knowledge of murders previously committed by members or associates of the Patriarca Family in furtherance of the interests of the Family's operations.

*Jason Angiulo*

Between 1979 and 1981, Jason Angiulo managed and supervised a gambling operation known as "Las Vegas Nights." Las Vegas Nights was routinely held at various locations in the Greater Boston area ostensibly to raise money for non-profit, charitable organizations. Testimony from members of the supposed sponsoring charities as well as from undercover FBI agents who attended Las Vegas Nights events revealed the following: (1) permits for certain events were obtained by falsifying signatures of members of charitable organizations in whose names the events were run; (2) gambling at the events was not operat-

ed by members of the charitable organizations that supposedly sponsored them; (3) events were held in the names of organizations that never authorized the use of their names; and (4) organizations, in whose names the events were held, received, in some instances, only token portions of the proceeds and, in others, nothing. In conversations intercepted at 98 Prince Street between January and March 1981 and introduced at trial, Jason Angiulo discussed the division of profits from Las Vegas Nights with his father, Gennaro Angiulo, and others.

*William Kazonis*

Evidence from recordings made at 98 Prince Street on March 24 and 25, 1981 revealed that once a grand jury was convened to investigate matters described above as well as the activities of other alleged co-conspirators in the Patriarca Family, defendant Kazonis conspired with Gennaro Angiulo and others to obstruct the grand jury investigation.

One Walter LaFreniere had been involved in loansharking activities of the Patriarca Family. In March 1981, Gennaro Angiulo learned that LaFreniere had been served with a grand jury subpoena to testify about the nature of those activities. Although Gennaro Angiulo was aware that LaFreniere refused to testify on Fifth Amendment grounds, he expressed concerns to LaFreniere's attorney, William Cintolo,[3] that if LaFreniere were granted immunity he would be compelled to expose the lending activities of defendant Jason Angiulo. A recorded conversation between Gennaro Angiulo, Richard Gambale, and Peter Limone[4] showed that Gennaro Angiulo asked the latter two to seek assurances from LaFreniere that he would not cooperate with the grand jury investigation. Gennaro Angiulo also instructed Cintolo to di-

sue in this case. He is not party to this appeal.

**2.** Ilario Zannino, like Gennaro Angiulo, was also separately convicted for crimes involving the alleged conspiracies at issue in this case, but he is not party to this appeal.

**3.** Under separate indictment, William Cintolo was convicted for his role in the conspiracy to

obstruct justice. On appeal, we affirmed his conviction. *United States v. Cintolo*, 818 F.2d 980 (1st Cir.1987).

**4.** Richard Gambale and Peter Limone were indicted with the defendants. They each pleaded guilty to obstruction of justice.

rect LaFreniere to refuse to testify and to serve a prison sentence instead. Other recorded conversations revealed that it was Gennaro Angiulo's intention to arrange the murder of LaFreniere if he did not cooperate. LaFreniere subsequently was informed by the FBI that there was a murder contract on his life.

On March 24, 1981, defendants Kazonis and Jason Angiulo met with Gennaro Angiulo. Kazonis explained that he had learned that LaFreniere planned to refuse to testify and to go to jail instead. After Gennaro Angiulo instructed defendant Jason Angiulo to testify falsely before the grand jury and he agreed to do so, the three men discussed the consequences that might befall defendant Jason Angiulo if he were caught lying. They also discussed the danger that LaFreniere's testimony posed for them. Gennaro Angiulo instructed Kazonis to meet with LaFreniere and explain the plan that he go to jail rather than testify. He made clear that it was Kazonis's responsibility to make sure that LaFreniere said nothing to the grand jury.

The following day, Kazonis reported back to Gennaro Angiulo and assured him that LaFreniere was told to keep quiet and go to jail for contempt. Later that same day, Kazonis and Cintolo each described to Gennaro Angiulo their meetings with LaFreniere and explained that they had each told LaFreniere that the maximum sentence he would serve for contempt would be 18 months.

On April 1, 1981, the government granted LaFreniere immunity for the testimony he was to give to the grand jury the following day. On April 2, Gennaro Angiulo and Cintolo instructed Kazonis to get a message to LaFreniere that if he were arrested for contempt, he should not talk to authorities. After seeking a continuance due to

Cintolo's disqualification as his attorney, LaFreniere eventually appeared before the grand jury on April 23, 1981 and refused to testify. On June 2, he was held in contempt and subsequently served 18 months in prison for that offense.

\* \* \* \* \* \*

The defendants raise numerous issues on appeal. Cincotti raises issues that pertain only to his conviction. Angiulo and Kazonis raise issues in common. We begin by addressing Cincotti's arguments. We then turn to the common issues raised by Angiulo and Kazonis and related issues asserted individually by those defendants.

## II.

We set the stage for our analysis of Cincotti's appeal by describing the allegations in the indictment pertaining to the RICO charges as well as the context in which Cincotti alleged errors at trial.

Cincotti was charged, in Count I, with conspiring to violate section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, under 18 U.S.C. § 1962(d). In Count II, he was charged with a substantive RICO violation under 18 U.S.C. § 1962(c).[5]

In the RICO conspiracy count, the government alleged, in paragraph 1, that Cincotti, Angiulo, and Kazonis joined together, as members and associates of the Patriarca Family of La Cosa Nostra, and thereby constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).[6] Paragraphs 3 and 4 of Count I then described in detail the nature and structure of the alleged enterprise and its functional relationship with La Cosa Nostra. Paragraph 2 alleged that Cincotti and his co-defendants "agreed together ... to conduct and participate, directly and indirectly, in the affairs

---

**5.** Section 1962(c) reads in full:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The conspiracy provision, section 1962(d), provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

**6.** An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

of the Enterprise ... through a pattern of racketeering activity as set forth in paragraphs 5 and 6 of this Count and the collection of unlawful debt, as set forth in paragraph 7 of this Count." [7] Paragraph 5 alleged that Cincotti engaged in two racketeering acts (or predicate crimes): (a) during April, 1981, he conspired with others to murder Harvey Cohen in violation of Massachusetts laws [8] and (b) from on or about October 20, 1980 until on or about May 18, 1981, he operated an illegal gambling business involving poker games in violation of Massachusetts laws. Paragraph 6 alleged that "[i]t was part of the conspiracy that [Cincotti] conducted and participated in, and agreed to conduct and participate in, the affairs of the Enterprise through a pattern of racketeering activity" involving the same acts described in paragraph 5. Finally, in paragraph 7, the government alleged that, as part of the conspiracy, Cincotti participated directly and indirectly in the affairs of the Enterprise "through the collection of unlawful debts ... incurred and contracted in gambling activity" in violation of Massachusetts laws.

Count II incorporated, by reference, all of the allegations of paragraphs 1, 3, 4, 5, 6 and 7 in Count I. It simply reasserted those allegations as constituting the substantive violation of 18 U.S.C. § 1962(c).

More than half-way through trial, on instructions from the district court, the government amended its original indictment to eliminate references to co-defendants who had pleaded guilty. The allegations in Counts I and II described above were identical in both the original and the redacted indictments. Cincotti filed a motion to dismiss, however, on the ground that the government made additional substantive changes, resulting in a violation of his Fifth Amendment right to be indicted by a grand jury. The district court denied that motion.

After the government rested, Cincotti moved for judgment of acquittal on the ground that he could not be convicted for the alleged RICO violations because at the time of the alleged violations, this court had held, in *United States v. Turkette*, 632 F.2d 896 (1st Cir.1980), *rev'd*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), that RICO prohibited only racketeering activities that furthered the interests of legal enterprises, not illegal ones like the Patriarca Family. Even though that decision had been subsequently reversed by the Supreme Court, Cincotti contended that a conviction would violate his constitutional rights to due process because he would suffer from an *ex post facto* application of RICO. The district court denied that motion also. The jury subsequently found Cincotti guilty of both the RICO conspiracy and the substantive RICO violation.

Cincotti now asserts the district court erred in denying his motion to dismiss the amended indictment and his motion for judgment of acquital. He also argues that there was insufficient evidence to support his substantive RICO conviction. We address each argument in turn.

## A. The Redacted Indictment

Cincotti contends that the district court erred in denying his motion to dismiss the

---

**7.** A "pattern of racketeering activity" is "at least two acts of racketeering activity," the first having been committed after the enactment of RICO and the second occurring within ten years of the first. 18 U.S.C. § 1961(5). Such acts include, *inter alia,* "any act or threat involving murder [or] ... gambling ..., which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

An "unlawful debt" is defined as:
a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.
18 U.S.C. § 1961(6).

**8.** The alleged conspiracy to murder Harvey Cohen may be a predicate offense underlying the RICO conspiracy because it is listed as a predicate offense under section 1961(1). *See United States v. Ruggiero,* 726 F.2d 913, 918–19 (2d Cir.1984).

indictment. He argues that by eliminating an allegation of a particular "overt act" in the redacted indictment, the government made a substantive change in the RICO conspiracy count and that this deprived him of his constitutional right to be indicted by the Grand Jury.

■ Our assessment of Cincotti's position begins with a review of the requirements for a valid RICO conspiracy charge that we established in *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981). In *Winter*, we held that to make out the elements of a RICO conspiracy charge the government must allege (1) the existence of an "enterprise," (2) that the defendant knowingly joined the enterprise and (3) that the defendant agreed to commit, or in fact committed, two or more specified predicate crimes as part of his participation in the affairs of the enterprise. *Id.; see also United States v. Turkette*, 656 F.2d 5, 8 (1st Cir.), *on remand from* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (charges that defendant joined enterprise, knew of its criminal activities, and agreed to commit two illegal predicate offenses in furtherance of the enterprise legally sufficient to make out racketeering conspiracy count). We now add that an agreement to collect unlawful debts, or actual collection of unlawful debts, can alternatively constitute the third required element of a RICO conspiracy.

■ We did not consider, in *Winter*, the function that "overt acts" might play in a RICO conspiracy indictment. We now join with those circuits squarely holding that the commission of "overt acts" is not required for a RICO conspiracy conviction. *E.g., United States v. Coia*, 719 F.2d 1120, 1123–24 (11th Cir.1983); *United States v. Barton*, 647 F.2d 224, 237 (2d Cir.1981). Since section 1962(d) does not, itself, require overt acts, there is no reason for us to imply such a requirement. *Id.* And we think the standards set forth in *Winter* are sufficient to the point of rendering superfluous any "overt act" requirement because, in any RICO conspiracy indictment the government must allege agreement to commit or commission of *specified* predicate crimes or, alternatively the collection of unlawful debts. That specificity is sufficient to alert defendants to the nature of the conspiracy for which they are being charged.

In this case, the government retained, in its amended indictment, the identical allegations constituting the elements of a RICO conspiracy charge against Cincotti that were present in its original indictment: (1) the existence of an enterprise, (2) Cincotti's knowing participation in the enterprise, and (3) his agreement to commit or actual commission of two *specified* predicate crimes ("racketeering acts"). No further allegations were needed, but by alleging that Cincotti participated in the enterprise's affairs through the collection of unlawful debts associated with gambling operations, the government sufficiently alleged an alternative ground for the third required element of the RICO conspiracy count.

■ "An indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form," but withdrawal of a portion of the indictment that the evidence does not support is not an impermissible amendment, "provided nothing is thereby added to the indictment, and that the remaining allegations charge an offense." *United States v. Winter*, 663 F.2d at 1139–40. The government's deletion of an "overt act" in its redacted indictment did not change any of the allegations of the original indictment that adequately had charged the substantive elements of a RICO conspiracy. Rather, by taking out the "overt act," the government merely eliminated a superfluous allegation that the evidence did not support.[9] The redacted indictment added no new charges, and the remaining allegations charged the same of-

---

**9.** The eliminated "overt act"—that Cincotti "instructed an underling to collect a gambling debt"—was based upon an intercepted conversation and a voice identification of Cincotti. At trial, the government was unable to prove the voice identification because a government witness testified that he was uncertain whether the voice on the tape was that of Cincotti.

fenses as the original. Under these circumstances, the changes in the indictment did not violate Cincotti's constitutional rights to be charged by indictment of the grand jury. *See id.* at 1140.

## B. Due Process

■ Cincotti next argues that, under *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), he was deprived of his constitutional right to due process because he was convicted for violating RICO under an unforseeable judicial construction of the statute, applied retroactively. He contends that during his participation in the activities that gave rise to his convictions, he had the right to rely upon our decision in *United States v. Turkette,* 632 F.2d 896, where we held that RICO does not apply to wholly illegal enterprises. He reasons that since the Patriarca Family of La Cosa Nostra was a wholly illegal enterprise, his participation in its activities could not constitute grounds for a RICO conviction under *Turkette.* While recognizing that our construction of an "enterprise" under RICO was subsequently reversed by the Supreme Court, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), he asserts that any application of the Supreme Court's decision would be an *ex post facto* application of criminal law in violation of his rights to due process of law.[10]

The government has supplied us with numerous counter arguments that check the progress of Cincotti's due process theory at every turn. We need not reiterate all of them to adequately dispose of this question.

This case is a far cry from the situation in *Bouie.* In that case, certain blacks entered a South Carolina restaurant and refused to leave when they were not served. There were no signs posted to indicate that the restaurant served whites only. The blacks were arrested and convicted for criminal trespass under a South Carolina statute that prohibited "entry upon the lands of another ... after notice from the owner or tenant prohibiting such entry." *Bouie v. City of Columbia,* 378 U.S. at 349–50 & n. 1, 84 S.Ct. at 1700–01 & n. 1. The Supreme Court of South Carolina upheld their convictions by construing the otherwise "admirably narrow and precise" language, 378 U.S. at 351, 84 S.Ct. at 1701, to prohibit the act of remaining on the premises of another after receiving notice to leave.

Recognizing that the Due Process Clause supports the "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime," *id.* at 350, 84 S.Ct. at 1701, the United States Supreme Court reasoned "[t]here can be no doubt that a deprivation of the right of fair warning can result ... from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.* at 352, 84 S.Ct. at 1702. Moreover, the Court said, "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* at 353, 84 S.Ct. at 1702.

Upon surveying South Carolina caselaw and that of other states with statutes carrying similar language, the Supreme Court concluded that the construction that the South Carolina Supreme Court had given to its criminal trespass statute was virtually " 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' " *Id.* 378 U.S. at 354, 84 S.Ct. at 1703 (quoting Hall, General Principles of Criminal Law

---

10. We decided *Turkette* on September 23, 1980. The Supreme Court granted *certiorari* on January 26, 1981, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), and then issued its opinion reversing our decision on July 17, 1981. The indictment charged Cincotti with RICO predicate offenses occurring in April, 1981 (conspiracy to murder Harvey Cohen) and between October 20, 1980 and May 18, 1981 (the operation of an illegal gambling business). The govern-ment's proof at trial did not vary from these dates. Thus, all of the activities leading to Cincotti's conviction occurred between our decision in *Turkette* and the Supreme Court's reversal of that decision. Yet most of the alleged criminal activities occurred after the Supreme Court granted *certiorari,* a factor we consider below in assessing Cincotti's reasonable reliance on our opinion as an authoritative construction of RICO.

(2d ed. 1960) at 58–59), 356–62, 84 S.Ct. at 1704–07. Thus, the state court's unforeseeable construction of the statute, applied retroactively, deprived the defendants of due process of law since, at the time they committed the charged offenses, they had no fair warning that their conduct was criminal. *Id.* at 361–62, 84 S.Ct. at 1706–07.

We cannot reasonably extend the principles of *Bouie* to the case at bar. In reversing our decision in *Turkette,* the Supreme Court held that the term "enterprise," as defined under 18 U.S.C. § 1961(4), *see supra* note 6, plainly and unambiguously included illegitimate or illegal enterprises, and that nothing in the legislative history of the statute provided otherwise. 452 U.S. at 580–93, 101 S.Ct. at 2527–34. The use of that term in the RICO statute was so unambiguous, in fact, that the Court refused to apply the "rule of lenity" to bar the application of its holding to the defendant in that case. *Id.* at 587–88 n. 10, 101 S.Ct. at 2531 n. 10. Implicit in the Court's rejection of the rule of lenity is the conclusion that the term was not sufficiently ambiguous to allow the defendant to be free of the retroactive application of the Court's decision. *See id.; United States v. Rodgers,* 466 U.S. 475, 484, 104 S.Ct. 1942, 1948, 80 L.Ed.2d 492 (1984). Thus, unlike the situation in *Bouie,* where a narrowly and precisely drawn statute could not possibly have been foreseen to render criminal the conduct in question, the meaning of the term "enterprise" in the RICO statute has been held by the highest authority to be so lacking in ambiguity before our *Turkette* decision that individuals could not reasonably rely on a possible limiting construction of that term to render their conduct noncriminal.

That this *post hoc* pronouncement differed from our own assessment can give little comfort to appellant. The fact that every other circuit court considering the issue had taken a stance opposite to our position in *Turkette, see* 452 U.S. at 578 & n. 1, 101 S.Ct. at 2526 & n. 1, coupled with the fact that the Supreme Court readily granted *certiorari,* should have placed Cincotti on notice that throughout the period of his conduct in question the authority of our *Turkette* decision was precarious at best. *See United States v. Rodgers,* 466 U.S. at 484, 104 S.Ct. at 2526 (rule of lenity not applied to defendant whose conviction was vacated by a circuit court when Supreme Court reversed opinion of that court and construed statute in question in line with every other circuit); *cf. Bouie v. City of Columbia,* 378 U.S. at 356–61, 84 S.Ct. at 1704–06 (neither plain statutory language nor South Carolina caselaw, or that of other states with similar statutes, in any way supported the construction adopted by the South Carolina Supreme Court). Thus, even if Cincotti established his reliance upon our decision in *Turkette,*[11] it would have been unavailing because the Supreme Court's reversal of that decision was reasonably foreseeable. *See United States v. Rodgers,* 466 U.S. at 484, 104 S.Ct. at 1948.

## C. Sufficiency of the Evidence

Cincotti's final argument is that his conviction for the substantive RICO violation should be reversed, or, in the alternative, a new trial granted due to insufficient evidence. In assessing this claim we view all of the evidence, including that pertaining to the credibility of witnesses, in the light most favorable to the government. *United States v. Cintolo,* 818 F.2d at 983.

The government could have proved the RICO violation in one of two ways: by showing that Cincotti engaged in two predicate offenses or by showing that Cincotti collected an unlawful debt. The government was required to show, in addition, that these acts were performed in furtherance of the Patriarca Family. *See* 18 U.S. C. § 1962(c), quoted *supra* note 5. As we

11. The government points out that there is no evidence in the record that Cincotti (as opposed to other alleged co-conspirators) did, in fact, rely upon our decision in *Turkette* when he engaged in the conduct that led to his RICO convictions. That lack of reliance, it seems, would vitiate his due process claim to be free of the retroactive application of the Supreme Court's decision in *Turkette. See United States v. Camara,* 451 F.2d 1122, 1124–25 (1st Cir. 1971).

set forth above, there were two predicate offenses charged in the indictment: Cincotti's participation in a conspiracy to murder Harvey Cohen and his operation of an illegal gambling business, both in violation of Massachusetts law. In addition, he was charged with the collection of unlawful debts. While not contesting the sufficiency of the evidence pertaining to his operation of an illegal gambling business, Cincotti claims that the government failed to prove his participation in plans to murder Harvey Cohen and his collection of an unlawful debt. We think the evidence was sufficient on both of these issues. We address each in turn.

■ Cincotti asserts that the tape recordings of conversations intercepted at 51 North Margin Street, which were played to the jury, contained simultaneous conversations that the jury could not distinguish in order properly to ascertain that Cincotti participated in a conspiracy to murder Cohen. Relying on the testimony of his expert witness, a voice therapist, he also argues that the government failed to present evidence of voice identification. We disagree.

A government witness, FBI Agent Rafferty, testified that he listened to the tape recordings intercepted at 51 North Margin Street, and based upon his own personal conversations with the defendant, identified the voice as that of Cincotti. The government also introduced into evidence videotapes of Cincotti that showed his presence at 51 North Margin Street during the time that the subject conversations were intercepted. Rafferty's testimony together with the circumstantial evidence of Cincotti's presence at the time of the conversations constituted sufficient evidence for the jury to conclude that it was Cincotti who was present and participated in the conversations with Zannino. *See, e.g., United States v. Vitale,* 549 F.2d 71, 73 (8th Cir. 1977); *United States v. Vento,* 533 F.2d 838, 864–65 (3d Cir.1976). Although Cincotti presented testimony contrary to that of Agent Rafferty, it was up to the jury to weigh the credibility of the witnesses and resolve any conflicts in the evidence. *See, e.g., United States v. Cuesta,* 597 F.2d 903, 915 (5th Cir.1979); *United States v. Vento,* 533 F.2d at 865.[12]

■ The jury, having listened to the tapes at trial, had the opportunity to assess evidence that was sufficient to establish Cincotti's involvement in the murder scheme. As the government points out, the tape of the April 3, 1981 conversations reveals that co-defendant Zannino told Cincotti: "This Harvey Cohen. I'm going to kill him, Johnny," and the tape of the April 23, 1981 conversations contained the statement from Zannino to Cincotti and others: "Johnny. And Johnny here's another thing ... you two and you. I want to kill Harvey Cohen very shortly. You ain't done a ... thing but tellin' me you're goin by his ... house and see his car." These statements, taken together and viewed in the light most favorable to the government, including any reasonable inferences to be drawn therefrom, were sufficient for the jury to conclude that Cincotti committed a RICO predicate offense by involving himself in a conspiracy to murder Harvey Cohen.

Cincotti does not contest the sufficiency of evidence for his illegal gambling conviction. That offense, coupled with the sufficient evidence that he participated in plans to murder Harvey Cohen constitute the commission of two predicate acts for his conviction on the substantive RICO count.[13]

**12.** We do not agree with Cincotti's argument that the jury should have given more weight to the testimony of Carolyn Kingston, the voice therapist who testified on his behalf, than to that of Agent Rafferty. As the government points out, while concluding that the characteristics of the voice alleged to be that of Cincotti were not the same in tape recordings for April 3 and 23, Kingston testified that she had never spoken directly to Cincotti and could not testify about his voice characteristics. Moreover, the district court ensured that the jury would properly resolve any conflict in the testimony concerning voice identification by instructing them that the government was required to prove the defendants' voice identifications for all alleged intercepted conversations played to the jury.

**13.** Cincotti does not challenge the sufficiency of evidence concerning the existence of the "enterprise" or the government's proof that he com-

We nevertheless address Cincotti's challenge to the sufficiency of evidence for the government's alternative basis for proving the RICO violation, that he allegedly collected of unlawful debts in connection with gambling operations.

■ Cincotti argues that all that was exposed by the government's evidence was his general involvement in gambling operations at 51 North Margin Street. He contends that there was no specific evidence of transactions that would constitute the collection of any "unlawful debt" as that term is used in the RICO statute. *See* 18 U.S.C. § 1961(6), quoted *supra* note 7. He argues:

> [I]t would appear that the government is relying on collection of debts incurred in gambling activity. It is clear from the tapes that what is going on is the settling up at the end of a poker game. This was hardly the intent of Congress when RICO was passed.

Brief of John Cincotti at 48.

We disagree. The definition of "unlawful debt" clearly contemplates the type of gambling debts involved in the illegal poker games operated by Cincotti at 51 North Margin Street. *See* 18 U.S.C. § 1961(6); Mass.Gen.Laws Ann. ch. 271, § 5 (West 1970). From evidence gleaned from both intercepted conversations and the execution of search warrants, the jury could have concluded beyond reasonable doubt that Cincotti engaged in the extension of credit and the collection of debts for the illegal gambling operation, and that these activities were carried out to further the interests of the Patriarca Family. This would support his conviction under 18 U.S.C. § 1962(c).

In sum, there was sufficient evidence for the jury to find Cincotti guilty of the substantive RICO violation by concluding that he engaged in either the predicate offenses (participation in a conspiracy to murder Harvey Cohen and the operation of an illegal gambling business) or the collection of unlawful debts, all of which included

mitted the alleged predicate acts in furtherance

participation in the affairs of the Patriarca Family.

### III.

The jury acquitted defendants Angiulo and Kazonis of the substantive RICO charges and the RICO conspiracy charges. It found Angiulo guilty, however, of operating an illegal gambling business, and returned verdicts against Kazonis for conspiring to obstruct and obstructing justice. Angiulo and Kazonis raise several issues on appeal. First, they contend that the district court erred in making "*Petrozziello* findings" regarding the scope of their involvement in the RICO conspiracy as a predicate for the admission into evidence of co-conspirators' statements concerning murders. Second, they contend that they were deprived of a fair trial on the non-RICO counts because of the prejudicial "spillover" effect of that evidence. Third, they argue that the district court abused its discretion in admitting into evidence testimony from a government expert witness concerning their association with the Patriarca Family. Fourth, they challenge, on several grounds, procedures followed in the government's recording and processing of conversations obtained through electronic surveillance at 98 Prince Street. Finally, they jointly assert that the government violated their Fifth Amendment rights to equal protection by using peremptory challenges systematically to remove blacks and Italian–Americans from the jury. We address each of these issues, as well as underlying sub-issues.

### A. Petrozziello Findings

Angiulo and Kazonis challenge the admission into evidence of certain tape recordings of discussions intercepted at 98 Prince Street, including the discussions of Gennaro Angiulo and others concerning plans to murder Harvey Cohen, threats on the life of Walter LaFreniere in relation to his grand jury testimony, and murders carried out in the past to further the interests of the Patriarca Family. These conversations were admitted against the defendants

of the enterprise's affairs.

under the co-conspirator provision of the hearsay rule, Fed.R.Evid. 801(d)(2)(E).[14] The defendants contend that the district court erred in finding, pursuant to *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977), that the government satisfied evidentiary prerequisites to the admission of this evidence under that rule.

■ Following typical procedures, at the close of the evidence the trial judge held a hearing, outside the presence of the jury, to make the *Petrozziello* determination. The court found that the government had shown that it was more likely than not that challenged statements concerning past and future murder plans were made in furtherance of the RICO conspiracy and that both Angiulo and Kazonis—having committed the predicate acts charged in the indictment in furtherance of the Patriarca Family—were members of that conspiracy.[15] While not challenging the district court's general finding that they were members of the alleged RICO conspiracy, the defendants assert that there was no evidence that they knew that the scope of that conspiracy included murders or murder conspiracies. They claim, as a result, that conversations of alleged RICO co-conspirators concerning past or present murders in furtherance of the interests of the Patriarca Family should not have been admitted against them.[16]

■ This argument lacks merit. As we recently pointed out in *United States v. Cintolo*, "[i]t is settled law ... that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of coconspirators, made after the formation and in furtherance of the conspiracy." 818 F.2d at 997; *see also United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987). As long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of. *See id.; United States v. Arruda*, 715 F.2d 671, 685 (1st Cir.1983). The defendants do not challenge the court's finding that they were members of the alleged RICO conspiracy and it was not clearly erroneous for the district court to conclude that they were aware, generally, that the Patriarca Family engaged in vio-

---

**14.** Rule 801(d)(2)(E) provides, in pertinent part:
A statement is not hearsay if— ... The statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**15.** The court found, *inter alia:*
Each of the defendants Jason Brion Angiulo and William Kazonis was a member of the RICO conspiracy as an associate of the Patriarca Family of La Cosa Nostra for at least the period ... during which statements of coconspirators received in evidence were made and that each of them was a member with knowledge of the scope and nature of the RICO conspiracy.
Tr. vol. 50, pp. 165–66. The court further found "that each of the substantive crimes charged against each of the defendants in this case has been proved by a preponderance of the evidence to have been committed in furtherance of the RICO conspiracy." *Id.* at p. 169. Taking into consideration evidence of these defendants' frequent visits to 98 Prince Street, their participation in discussions and sessions involving decision-making by Gennaro Angiulo concerning various illegal activities of the Family, including some in which they participated, the

district court concluded that both Angiulo and Kazonis
[were] aware of the organizational relationship among Gennaro Angiulo and others who participated in conversations in his presence and that [they] knew the nature and scope of the RICO conspiracy—that is, the Patriarca Family of La Cosa Nostra—including its willingness to engage in extreme criminal activities, even murder, when those in decision-making positions felt the need to resort to extreme measures to protect what they perceived to be the interests of the organization.
Tr. vol. 51, pp. 41–44. The defendants objected to these conclusions.

**16.** Although the jury eventually acquitted both Angiulo and Kazonis on the conspiracy charges, it does not follow that the district court erred in finding that they were participating members of the RICO conspiracy for the purpose admitting evidence pursuant to Rule 801(d)(2)(E). While the more lenient preponderance of the evidence standard supports the district court's *Petrozziello* finding, the defendants' convictions for the RICO crimes would have to have been based, of course, upon findings beyond a reasonable doubt. *See United States v. Masse*, 816 F.2d 805, 810 n. 8 (1st Cir.1987).

lent crimes, even murders, to further its own interests. In these circumstances it was proper for the court to allow into evidence statements of alleged RICO co-conspirators concerning murder plans on behalf of the Patriarca Family. *See United States v. Cintolo,* 818 F.2d at 998; *United States v. Baines,* 812 F.2d at 42; *United States v. Arruda,* 715 F.2d at 684–85.

### B. Insufficient Limiting Instructions

The defendants' more substantial claim is that the conversations pertaining to the organization's murder plans were completely irrelevant to the counts upon which the jury convicted them. They argue that even if the co-conspirator statements were admissible on the RICO counts, the district court did not properly instruct the jury to compartmentalize the evidence in a way that would sufficiently protect them from the jury's consideration of that evidence with regard to the non-RICO crimes for which they were convicted. As a result, they contend that they were prejudiced by "evidentiary spillover" and deprived of fair trials.[17]

In setting forth its *Petrozziello* findings the district court found that the conversations of alleged RICO co-conspirators regarding the murder plans would be admissible as evidence tending to show the defendants' motive, design or intent in participating in the RICO conspiracy or committing the other substantive violations charged in the indictment. Tr. vol. 50, p. 169. The court later instructed the jury to limit its consideration of the tape-recorded statements by alleged co-conspirators as follows (the defendants' names and the corresponding counts on which they were convicted are presented in italics):

During the trial and especially during your hearing of the tape-recorded conversations you have heard evidence of alleged statements by alleged co-conspirators. Unless I instructed you otherwise in a particular instance, you may consider such evidence without any special limitations as you are weighing the charges against each of the defendants in Counts 1 [RICO conspiracy], 2 [substantive RICO violation], and 6 [*conspiracy to obstruct justice* (Angiulo and *Kazonis*)] of the indictment except as to your consideration of predicate acts charged.

When you are considering Counts 3 [Cincotti], 4 [illegal gambling (Kazonis and Angiulo)], 5 [*illegal gambling (Angiulo: "Las Vegas Nights")*], 7 [*obstruction of justice (Kazonis)*] and 8 [obstruction of justice (Angiulo)] and when you are considering predicate acts charged in Counts 1 and 2, the following limiting instruction applies:

In relation to any charge against a particular defendant in Counts 3, 4, 5, 7 and 8, when you are considering evidence of a co-conspirator statement made when that defendant was not present, you may consider it for the limited purpose of such bearing, if any, as you find it to have in relation to the intent, motive or other state of mind of that defendant. You will not consider it for any other purpose except as permitted by the following instruction:

*You will not consider evidence of a co-conspirator statement made when the defendant was not present as evidence of the defendant's participation in a particular offense or predicate act charged unless, first, that statement re-*

---

**17.** This issue was raised on several occasions in the course of hearings pertaining to the district court's *Petrozziello* findings and proposed jury instructions. Tr. vol. 50, pp. 10–19, 72–76; Tr. vol. 51, pp. 77–87; Tr. vol. 52, p. 217, 227. The defendants argued that the jury should have been instructed to ignore all alleged co-conspirator statements not pertaining to the particular predicate offenses charged against them. *See* Tr. vol. 50, pp. 17–18. Although conceding that they cannot claim improper joinder of substantive counts in the indictment, the defendants attempt to analogize from misjoinder cases to argue that an "appropriate limiting instruction" was necessary to safeguard against "evidentiary spillover." We have searched the record for a proposed limiting instruction from the defendants and found none. We note, however, that since the defendants objected throughout the trial to the jury's consideration of alleged co-conspirator statements pertaining to murders and maintained that objection when reluctantly accepting the limiting instruction proffered and given by the court, their challenge to the instruction is sufficiently preserved for our review.

*lated to the particular offense or predicate act charged in the count you are considering and, second, that statement related to participation in that offense or predicate act by the defendant as to whom you are considering the charge.* (Emphasis added.)

Tr. vol. 52, p. 175. In short, the jury was allowed to consider the statements of alleged co-conspirators for whatever purpose in their determination that Kazonis was guilty, and Angiulo not guilty, of conspiring to obstruct justice (Count 6). However, in considering whether Angiulo and Kazonis were guilty on the illegal gambling counts (Counts 4 and 5) and whether they were guilty on the substantive obstruction of justice counts (Counts 7 and 8), the jury could only consider the alleged co-conspirator statements as they might bear upon those defendants' general states of mind, but not otherwise as proof of their commission of the crimes charged *unless* the statements related to (a) the substantive offenses charged and (b) the particular defendant's participation in that substantive offense. In addition, at the outset of its charge to the jury, the district court instructed the jury to consider separately each separate charge against each individual defendant. Tr. vol. 52, p. 145.

### 1. Co-Conspirator Statements and the Conspiracy to Obstruct Justice Charge Against Kazonis

While we recognize the inherent complications involved in designing a jury charge that will compartmentalize evidence of separate, but interconnected, conspiracies in the context of a multiple defendant RICO trial of this sort, we are troubled by the court's instruction that the jury could consider, "without any special limitation," statements of the "alleged co-conspirators"

in determining Kazonis's guilt or innocence in the alleged conspiracy to obstruct justice (Count 6). By so instructing, the court allowed the jury to consider statements of alleged *RICO* co-conspirators regarding plans to murder Harvey Cohen and others when determining whether Kazonis participated in a wholly separate conspiracy to obstruct justice. The statements pertaining to the conspiracy to murder Harvey Cohen and others were largely irrelevant to the latter conspiracy.[18]

Nevertheless, we are convinced, in light of the evidence and what the jury did find, that any improper failure to give a further limiting instruction did not harm Kazonis.

First, the jury did not find him guilty of either the RICO conspiracy or the substantive RICO offense charged in the indictment, and returned mixed verdicts against the defendants charged with those offenses. This shows that the jury was able to isolate evidence relevant to the RICO conspiracy from that relevant to the separate alleged conspiracy to obstruct justice. *See United States v. Porter*, 764 F.2d 1, 13 (1st Cir.1985) (fact that jury returned different verdicts against jointly charged and tried co-defendants indicates that court's limiting instruction enabled jury separately to consider evidence pertaining to guilt or innocence of each defendant).

Second, the instruction allowing the jury unlimited consideration of the alleged RICO co-conspirators' statements did not apply to or taint the jury's conviction of Kazonis for the *substantive* obstruction of justice count (Count 7), and there was more than sufficient evidence for the jury to find that Kazonis obstructed justice by interfering with LaFreniere's appearance before the grand jury. *See supra* pp. 961–62.

---

18. We note, however, that Kazonis cannot object to the jury's consideration of statements concerning plans to murder Walter LaFreniere in assessing his guilt under Count 6. Although the indictment alleged that Kazonis conspired, with others, to obstruct justice by agreeing only "to threaten, inform, request and otherwise cause Walter LaFreniere to refuse to testify" before the Grand Jury, it also alleged that members of the same obstruction conspiracy agreed, as part of that conspiracy, to kill Walter LaFre-

niere. Since the district court found, by a preponderance of the evidence, that Kazonis was a member of the obstruction conspiracy and that violent means were employed by other members of that conspiracy to further its objectives, the statements of co-conspirators regarding plans to murder LaFreniere were admissible against him on Count 6. *See, e.g., United States v. Cintolo*, 818 F.2d at 997–98; *United States v. Arruda*, 715 F.2d at 685.

To convict Kazonis for *conspiring* to obstruct justice, the jury needed to find, in addition to the elements of the substantive offense, only that Kazonis agreed, or reached an understanding, with others to accomplish that offense. The existence of such an agreement or mutual understanding was established by more than substantial evidence, *see supra* at p. 961, regardless of the collateral evidence of statements of alleged RICO co-conspirators concerning the Patriarca Family's murder plans before the jury.

Thus, we find harmless beyond reasonable doubt the district court's error in allowing the jury broadly to consider alleged RICO conspirators' statements in assessing the separate obstruction of justice conspiracy charge asserted against Kazonis. *Cf. United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 732–33 n. 13, 88 L.Ed.2d 814 (1986) (error involving misjoinder of defendants requires reversal only if it had a substantial and injurious effect or influence in determining jury's verdict, and a limiting instruction to jury to separately consider evidence for guilt of separate defendants minimizes any prejudice).[19]

### 2. Co-conspirator Statements and the Substantive Charges Against Kazonis and Angiulo

■ On the substantive charges that Angiulo engaged in an illegal gambling business and Kazonis obstructed justice (Counts 5 and 7), the jury was permitted to consider statements of "alleged co-conspirators" for the bearing such statements might have on the defendants' "intent, motive or other state of mind."

We can understand that the statements of members or associates of the Patriarca Family could be relevant to show how it deals with those who either fail to cooperate with the Family or interfere with its operations. In that sense, statements of the alleged RICO co-conspirators pertaining to murder plans could be relevant to show why individuals knowledgeable in the affairs of the Family would carry out certain offenses on its behalf.[20] As part of its *Petrozziello* findings, the district court found, by a preponderance of evidence, that both Angiulo and Kazonis were associates of the Patriarca Family and knowledgeable in its affairs and that they carried out the predicate acts charged in the indictment in furtherance of the Family's interests. Thus, statements by the RICO conspirators showing generally how the Family dealt violently with uncooperative individuals could have been relevant to show Angiulo's and Kazonis's states of mind in agreeing to carry out the predicate offenses underlying the RICO counts as the court instructed. *Cf. United States v. Daly and Giardina*, 842 F.2d 1380, 1387 (2d Cir.1988) (taped conversations of alleged RICO co-conspirators not mentioning

---

**19.** In so concluding, we also reject Kazonis's contention that he was entitled to an instruction that the scope of his involvement in the alleged conspiracy to obstruct justice did not include murder plans. Brief of William Kazonis at 22–24. As we pointed out, *supra* note 18, the government did not allege that Kazonis agreed to murder LaFreniere as part of the conspiracy to obstruct justice, but the statements of co-conspirators who did plan to murder LaFreniere in order to carry out the same conspiracy to obstruct justice were admissible against him. Moreover, in instructing the jury on the alleged conspiracy to obstruct justice, the district court did not focus the jury's attention on statements concerning any murder plans. It properly instructed that the government was required to prove that Kazonis intentionally agreed to obstruct justice through unlawful means, which could include efforts to advise or plan "with the witness to invoke the Fifth Amendment improp-

erly" or "to limit or give false testimony before the Grand Jury." Finally, there was clearly sufficient evidence for the jury to convict Kazonis of conspiring to obstruct justice without taking into account statements concerning the Family's murder plans. *See supra* p. 961.

**20.** Kazonis was charged with substantive obstruction of justice both as a predicate offense underlying the RICO counts and as a separate offense. Angiulo was charged with the operation of an illegal gambling business both as a predicate offense of the RICO counts and as a separate offense. We understand how—given the interconnection between the separately charged offenses and the predicate acts underlying the RICO conspiracy count for both Kazonis and Angiulo—the district court could conclude that Rule 801(d)(2)(E) permitted the admissibility of these statements against all members of the charged RICO conspiracy.

defendant admissible to show setting of alleged offense).

On the other hand, as both Kazonis and Angiulo point out, the relevance of such statements is highly attenuated when there is no proof that they had actual knowledge of the contents of those statements. The fact that such conversations included discussions of murder added the possibility that they could prejudice the defendants if given undue weight by the jury. We might question the propriety of the court's instruction, in this light, were it not for the subsequent limitation (italicized in the excerpt above) that minimized the weight that the jury attached to such statements; the jury was only permitted to consider such statements, beyond implications as to the defendants' states of mind, if they were made in the presence of the particular defendant in question *and* related to the offense for which that defendant was charged.

For Angiulo, the statements of alleged co-conspirators relating to murder plans, made outside of his presence and unrelated to the charge that he operated an illegal gambling business, were not probative on that alleged offense. That the Patriarca Family was willing to murder people that interfered with, or failed to carry through, its operations was irrelevant to Angiulo's state of mind in conducting such an operation. Nevertheless, the limiting instruction (set forth in italics above) properly directed the jury not to consider those statements in deciding whether Angiulo participated in the illegal gambling offense unless he was present when the statements were made and they related to that offense.[21] Looking at the instruction as a whole, we conclude that it did not result in prejudicial error warranting reversal of Angiulo's conviction for operating an illegal gambling business. *Cf. United States v. Porter,* 764 F.2d at 13 (appropriate limiting instructions adequately safeguarded against evidentiary spillover; we will not entertain speculative allegations of prejudice).

For Kazonis—who was found by the district court, in its *Petrozziello* findings, to be a member of the alleged RICO conspiracy, knowledgeable about the Family's general operations (including murders), and to be furthering the Family's interests through the obstruction of justice—evidence of the Family's practices in dealing violently with those they disapproved of may have had some bearing on his intent or motive to interfere with LaFreniere's testimony before the grand jury. *See United States v. Daly and Giardina, supra* at 1387. In any event, the limiting instruction insured that, in assessing Kazonis's "participation" in the substantive obstruction of justice offense, the jury would not consider the statements concerning the Family's murder plans, other than those involving Walter LaFreniere, *see supra* note 18, because those statements were made outside of Kazonis's presence and were unrelated to the alleged obstruction of justice. Beyond this, the district court properly instructed the jury on the specific facts that the government was required to prove in order to convict Kazonis for obstructing justice, *see supra* note 19, and there was more than sufficient evidence for the jury to convict him on that count, without any consideration of statements pertaining to murder plans. *See supra* pp. 961–962.

## C. Admissibility of Expert Witness Testimony Concerning the Defendants' Association with the Patriarca Family

The government called FBI Agent James Nelson to give expert testimony on the structure and operations of La Cosa Nostra and, after listening to evidence presented at trial, his opinion regarding the defendants' relationships to that organization. He testified that both Angiulo and Kazonis were "close associates" of the Patriarca Family of La Cosa Nostra.

While not contesting Agent Nelson's qualifications as an expert on La Cosa Nostra, Angiulo and Kazonis argue that his testimony violated their rights to confron-

---

**21.** There were no alleged co-conspirator statements *admitted into evidence concerning murders that were made in Angiulo's presence and* related to his alleged operation of Las Vegas Nights.

tation under the Sixth Amendment because the district court allowed him to testify even though he did not reveal the identity of certain informants. They also contend that the district court improperly admitted his testimony on issues that were within the province of the jury or related to the defendants' states of mind. We address each of these contentions.

■ At trial, the defendants maintained that allowing Agent Nelson to testify without disclosing the identities of informants would violate Rule 705 of the Federal Rules of Evidence, which requires expert witnesses to disclose facts and data underlying their opinions on cross-examination.[22] They also argued that they would be deprived of their Sixth Amendment rights to fully cross-examine the witness because they would not be able to ascertain or test his credibility without knowing the sources of his information. While preserving an objection that none of his testimony should be allowed, the defendants agreed to the court's instruction to Agent Nelson that he not answer any questions on direct examination that would be based upon information provided by informants whose identity he could not disclose on cross-examination.

The defendants contend that the court's instruction to Agent Nelson failed adequately to protect their confrontation rights for the following reasons: Agent Nelson was entrusted to sort out, in his own mind, those opinions grounded upon information that he was willing to disclose and those grounded upon sources he could not disclose; as such, to the extent that some of the sources he would not disclose had provided information that contradicted the opinions he was otherwise willing to express, the defendants were deprived of information that would allow them to test the credibility of his testimony on cross-examination. We disagree.

Although the defendants claim that the jury could not have believed otherwise than that Agent Nelson based his opinion that they were close associates of the Patriarca Family on the wide range of informants with whom he had conferred, including those whose identities he would not reveal, Agent Nelson testified that his particular opinion regarding these defendants' relationship to the organization was based only upon tape recordings played at trial. Tr. vol. 29, p. 112.[23] Moreover, the defendants were given wide-ranging opportunities to cross-examine Agent Nelson on his opinions and the factual bases underlying them. Under these circumstances, we find no merit in the defendants' contention that Agent Nelson's testimony was admitted in violation of Rule 705's requirement that experts disclose, on cross-examination, factual sources underlying their opinion testimony. *See United States v. Hensel,* 699 F.2d 18, 39 (1st Cir.1983). Nor do we find the defendants' rights to adequate cross-examination of this witness under the Confrontation Clause in any way threatened by the procedures followed. *See, e.g., Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985); *United States v. Bastanipour,* 697 F.2d 170, 176–77 (7th Cir.1982).[24]

---

**22.** Rule 705, "Disclosure of Facts or Data Underlying Expert Opinion," provides:

> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

**23.** Agent Nelson testified about the different positions held by various individuals in the organization and the titles associated with those positions. Using a diagram, he explained that, based on his analysis of the tape recordings, Raymond Patriarca was the "boss" of the Patriarca Family, Gerry (Gennaro) Angiulo was the "underboss," Nicolas Angiulo was the "consigli-

ere," and that John Cincotti was a "soldier" in the "capo regime" of Larry Zannino. Tr. vol. 29, p. 110. He testified that Jason Angiulo and William Kazonis fell within the category of close "associates" of the Patriarca Family. *Id.* at 121.

**24.** The defendants seem to argue that even if Agent Nelson's particular testimony concerning Angiulo's and Kazonis's association with the Patriarca Family was based upon evidence presented at trial, he could not have formed his opinions concerning collateral relationships in the organization that were essential to that testimony, without access to informants' disclosures to him. A careful review of the record reveals, however, that Agent Nelson was able conclusive-

The defendants nevertheless argue that the district court erred by overruling their objections that Agent Nelson's testimony was inadmissible under Rule 702 of the Federal Rules of Evidence, because it was not helpful to the jury's factfinding,[25] and Rule 704(b), because his description of their particular activities was an impermissible expert opinion on their intent to commit the crimes for which they were found guilty.[26] Neither argument is persuasive.

■■■ Rule 704(b) does not apply to Agent Nelson's testimony because he did not testify as an expert on the defendants' mental states. *See United States v. Cox*, 826 F.2d 1518, 1524–25 (6th Cir.1987). His testimony that the tapes indicated that they were close associates of the Patriarca Family was simply not a statement of opinion about defendants' mental state or condition. That it may have provided part of the basis for an inference of such state is unhelpful to defendants. *See United States v. Daly and Giardina, supra* at 1387–88.

■■■ Although we have recognized that expert testimony of law enforcement officials concerning the particular methods and practices of those engaged in organized criminal activity carries the risk of prejudicing criminal defendants, we have made clear that such evidence is often helpful to the factfinder in understanding the criminal activity at issue. *United States v. Hensel*, 699 F.2d at 38; *see United States v. Daniels*, 723 F.2d 31, 33 (8th Cir.1983). We give district courts broad discretion to determine the admissibility of such expert testimony. *Hensel* at 38. Expert testimony, similar to that of Agent Nelson, is helpful in cases where juries must make determinations about the nature and structure of complex criminal organizations al-

leged to be engaged in criminal activities. *E.g., United States v. Patterson*, 819 F.2d 1495, 1507 (9th Cir.1987); *United States v. Ardito*, 782 F.2d 358, 363 (2d Cir.1986); *United States v. Riccobene*, 709 F.2d 214, 230–31 (3d Cir.1983). In the circumstances of this case, Agent Nelson's testimony assisted the jury in understanding the complex structure of the Patriarca Family and the defendants' relationship to members of that organization, as evidenced by the tape recorded conversations. The district court did not abuse its discretion in admitting Agent Nelson's testimony under Rule 702.

**D. Challenges to the Government's Electronic Surveillance**

Alleging that the government violated various provisions of the Omnibus Crime Control and Safe Streets Act of 1969 pertaining to "Wire and Electronic Communications Interception and Interception of Oral Communications," 18 U.S.C. §§ 2510–2521, Angiulo and Kazonis moved to suppress all tape recordings of conversations recorded by the government at 98 Prince Street and 51 North Margin Street. After hearing arguments and taking written submissions from the parties, the district court denied the defendants' motions. *United States v. Gambale*, 610 F.Supp. 1515 (D.Mass.1985). The defendants now assert that the court erred in failing to suppress that evidence, or, alternatively, by not providing them with evidentiary hearings on their suppression motions.

As a preliminary matter, we agree with the district court that Angiulo and Kazonis had no standing to challenge the admissibility of the tape recordings made at 51 North Margin Street. We adopt the well-reasoned opinion of the district court on that

---

ly to form his opinions on these collateral relationships in the organization from non-confidential sources of information.

**25.** Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**26.** Rule 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

point. 610 F.Supp. at 1521–22. Thus, we focus solely on the defendants' challenges to the tape recordings of conversations recorded at 98 Prince Street.

## 1. Background

Electronic surveillance of 98 Prince Street began on January 19, 1981 and continued through May 3, 1981. On April 10, 1981, the district court granted the government's motion for a "disclosure order" pursuant to 18 U.S.C. § 2517(5), thereby allowing the government to utilize intercepted conversations to prosecute offenses that were not specified in the district court's surveillance orders, including the RICO charges.

The government did not simultaneously record duplicate originals of all recorded conversations, but made copies of all the conversations as the surveillance progressed. In the course of the surveillance, the agents monitoring the tapes became aware of audibility problems. On May 5, 1981, the original tapes were placed under seal and supervision of the district court in compliance with 18 U.S.C. § 2518(8)(a), which provides that "[i]mmediately upon the expiration of the period of the order [authorizing surveillance], ... such recordings shall be made available to the judge issuing such order and sealed under his directions."

On three occasions, however, between June and September 1981, the government moved for and was granted the right to unseal the bulk of the original tape recordings (over 300 in total) for audio enhancement purposes. The government allegedly needed to use the originals for the enhancement process because of background noise in the copies. Pursuant to judicial order, the government was permitted to transport the tapes to Washington, D.C., where they were enhanced and then returned to the court and placed under seal again.

After the grand jury returned its indictment, Angiulo, Kazonis and other co-defendants filed motions to suppress the tape recordings contending, *inter alia*, that the court should suppress the original tapes because (1) the sealing requirement of 18 U.S.C. § 2518(8)(a) had been violated, (2) the government failed to minimize the interception of conversations outside the scope of the court's surveillance orders in violation of 18 U.S.C. § 2518(5), and (3) under 18 U.S.C. § 2517(5), the court could not allow the government to utilize (or "disclose") intercepted conversations unrelated to offenses set forth in the surveillance orders. The defendants now appeal the district court's denial of their motion to suppress on these grounds.[27]

## 2. Sealing Requirements

The question of whether and under what circumstances the government may unseal tape recordings previously sealed pursuant to 18 U.S.C. § 2518(8)(a) is one of first impression for us, and it has not, to our knowledge, been addressed by any other circuit.

Section 2518(8)(a) provides, in pertinent part, as follows:

The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders.... The presence of the seal pro-

---

27. Although the defendants assert, in the alternative, that they should have been granted evidentiary hearings on these issues, in their motion before the district court they sought such a hearing only on their contention that the government violated the statutory minimization requirements. *See* Record Item # 184 (defendants' motion and memorandum in support of motion to suppress and for evidentiary hearing). Their argument concerning the alleged violation of the sealing requirement centered solely on legal questions; they relied primarily on evidentiary material from the case of co-defendant Cintolo for their factual assertions. In arguing that the disclosure order was improper, they moved for additional discovery of grand jury proceedings, but not for an evidentiary hearing. The district court denied the defendants' request for an evidentiary hearing on the minimization issue, and we review only that denial of an evidentiary hearing. *See infra* note 32.

vided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.[28]

We recently addressed, in *United States v. Mora*, 821 F.2d 860 (1st Cir.1987), the issue of whether section 2518(8)(a) mandated the suppression of intercepted conversations when the government failed "immediately" to place original tapes under judicial seal after the expiration of the period for authorized surveillance. We concluded that section 2518(8)(a) contained its own exclusionary rule, and if the government failed to comply with the sealing requirements of that section, surveillance evidence would have to be suppressed unless the government proved by clear and convincing evidence that there was a "satisfactory explanation" for its failure immediately to seal. *Id.* at 866–68. Recognizing that the essential purpose of this section "is to protect the authenticity and accuracy of the recordings," we held that the government's first task in establishing a "satisfactory explanation" would be to prove that the integrity of the tapes had not been compromised. *Id.* at 867. If it met that burden, the government would then be required to show that its delay in sealing came about in good faith and that such delay did not prejudice the accused or provide the prosecution with a tactical advantage. *Id.* at 868–69.

The district court's decision not to suppress the tapes in the case at bar was made prior to our decision in *Mora*. The court concluded, in any event, that cases from other circuits addressing the problem of delays in sealing were inapplicable to the question of whether a judicial order allowing unsealing was proper. *United States v. Gambale*, 610 F.Supp. at 1526. It held that Congress simply failed to address the question of unsealing, and that courts have "inherent authority to order unsealing of tapes previously sealed upon a showing of good cause." *Id.* The district court therefore rejected the defendants' position that the statute automatically required suppression of the tapes because of the government's unsealing.

■ We agree that the defendants' argument for automatic suppression of unsealed tapes is untenable. While such unsealing should never be allowed as a matter of course, courts should have the discretion to order temporary unsealing, as the district court concluded, for good cause shown.[29] On the other hand, defendants are not without protection in the unsealing context; we think that the standards applicable in delay-of-sealing cases, like *Mora*, are relevant to the unsealing problem.

The court's order allowing the government to unseal the original tapes and transport them to Washington, D.C. for enhancement outside the presence of any judicial officer created a risk that the original tapes could be altered or tampered with. We agree with the district court's apparent reasoning, *see* 610 F.Supp. at 1526, that there was perhaps some moral deterrent to the agents' alteration of the tapes since the government's unsealing and transportation of the tapes was prescribed by court order. But that does not eliminate the risk of alteration addressed by section 2518(8)(a).

---

**28.** Section 2517(3), which "is the general authorization-for-use statute concerning intercepted communications," *United States v. Mora*, 821 F.2d 860, 863 n. 2 (1st Cir.1987), provides:

Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

**29.** We recognize that there may be many instances in which either the prosecution or the defense would want to unseal original tape recordings. The prosecution, for instance, might need to check the originals against portions of duplicates that were inadvertently erased. Defense counsel, in turn, might ask that the tape recordings be unsealed so that they can check the accuracy of duplicate tape recordings or transcripts that they have obtained through discovery from the prosecution.

In cases involving unsealing of tapes, there would seem to be no less of a risk of frustrating the purposes underlying section 2518(8)(a)—the assurance of the accuracy and genuineness of tape recordings—than in situations where the government fails "immediately" to place the original tapes under seal. To the extent that the procedures followed in sealing or unsealing compromise the integrity of tape recorded conversations, the congressional purposes underlying section 2518(8)(a) would be thwarted and suppression of that evidence would be called for. *See United States v. Mora,* 821 F.2d at 867. We therefore conclude that the guidelines set forth in *Mora* apply to cases involving the government's unsealing.

■ Accordingly, judicial orders authorizing the unsealing of tape recordings previously placed under judicial seal pursuant to section 2518(8)(a) should be granted only for good cause shown by the government. If the unsealing of such tapes is challenged in a motion to suppress, the government should be required to prove (1) that the unsealing and use of the tapes did not result in alterations or tampering and (2) that the circumstances necessitating unsealing were not manufactured for tactical gain and that the defendants will not be unduly prejudiced as a result of the unsealing. *See United States v. Mora,* 821 F.2d at 867–68.

■ In this case all standards have been met. First, the district court properly found that the government made a "good cause" showing for the temporary unsealing. *United States v. Gambale,* 610 F.Supp. at 1526. Second, although the court made no pretrial findings, the record shows that there was extensive examina-tion and cross-examination of the agents involved in the custody and enhancing of the tapes while unsealed, and permits only the conclusion that the integrity of the tapes was not compromised. The chain of custody was clearly established, the extensive spatial security arrangements at the FBI headquarters, where the tapes were kept, were described, and agents Quinn and Ritenour, who were in charge of the custody and enhancement process, testified unequivocally that there were no unauthorized persons with access to the tapes, no tampering, no deletions, and no additions.[30] Third, we find no indication or suggestion of bad faith or of unnecessary delay in returning the tapes to the court after enhancement.

### 3. Minimization

The defendants contend that the tapes should not have been admitted against them because the government violated section 2518(5), which requires that every authorized surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5). They argue that the government's practice of "intermittent monitoring"—the practice of randomly turning the recording equipment on for two minutes and then off for one minute—was not proper compliance with section 2518(5)'s "minimization" requirement; and they point to the government's widespread interception, in the early weeks of surveillance, of conversations that were noncriminal in nature as evidence of the government's violation of the statute. We agree with the district court's treatment of these arguments. *See United States v. Gambale,* 610 F.Supp. at 1527–29.[31]

---

**30.** While, in this case, the government had no trouble in establishing the integrity of the tapes while unsealed, the potential for challenging witnesses' memories and credibility suggests the prudence of minimizing the problem of proving that no alterations occurred. For instance, the government could make simultaneous original recordings so that one untouched original could always remain under seal. Alternatively, if only one original is made and sealed, and only the original will do for enhancement, a copy of the original could be left under seal with the court.

In either case, the defendant would then be able to check the enhanced original against a sealed original or copy for possible alterations.

**31.** In addressing the defendant's argument, the district court made certain factual findings. It found:

Every monitoring agent maintained a log book in which the date, time, and substance of any intercepted communications were recorded, as well as the identities of the participants, if known. Other agents reviewed the

The Supreme Court has pointed out that section 2518(5) "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case." *Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 1724, 56 L.Ed. 2d 168 (1978). And whether the statute has been violated in any particular case depends upon the objective reasonableness of the agents' conduct. *Id.* at 137, 98 S.Ct. at 1723; *United States v. Clerkley*, 556 F.2d 709, 716 (4th Cir.1977).

 We follow the majority of other circuits that have considered this question and look to three key factors to ascertain, in any given case, whether the minimization requirements of section 2518(5) have been met: (1) the nature, scope, and complexity of the alleged criminal activities under investigation; (2) the extent to which the government had accrued, in advance of the surveillance, information needed to screen out conversations that were not within the scope of alleged offenses under investigation through the authorization for surveillance; and (3) the degree of judicial supervision over the surveillance practices. *See id.; United States v. Daly*, 535 F.2d 434, 441–42 (8th Cir.1976); *United States v. Vento*, 533 F.2d 838, 852–53 (3d Cir. 1976); *United States v. Quintana*, 508 F.2d 867, 874–75 (7th Cir.1975). Considering each of these factors, we conclude that the government's surveillance of 98 Prince Street did not violate the statute.

 First, the alleged criminal activities that the agents were authorized to investigate were highly organized and complicated, involving multiple parties. In this situation, as the district court pointed out,

" 'more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.' " *United States v. Gambale*, 610 F.Supp. at 1529 (quoting *Scott v. United States*, 436 U.S. at 140, 98 S.Ct. at 1725).

Second, in the initial stages of surveillance, the monitoring agents could not easily decipher which conversations were and were not relevant to the alleged offenses under investigation. Given the complex nature of the criminal activities in question and the jargon used by those under investigation, it was reasonable for the agents to monitor, almost continuously, the conversations taking place at 98 Prince Street in order to discern patterns of conversation that were and were not relevant. *See Scott v. United States*, 436 U.S. at 140–42, 98 S.Ct. at 1724–26; *United States v. Clerkley*, 556 F.2d at 717. This was particularly true during the early stages of the surveillance, *see Scott*, 436 U.S. at 141, 98 S.Ct. at 1725, which was the only time, the defendants claimed, that the agents intercepted a large number of conversations unrelated to criminal offenses. *See United States v. Gambale*, 610 F.Supp. at 1529. In addition, the intermittent monitoring technique used by agents to minimize interceptions of conversations beyond the scope of the surveillance authorizations was a reasonable and appropriate method for "spot-checking" the flow of conversations in case the subject matter of those conversations turned from matters outside of the authorized investigation to matters within the surveillance authorization. *See, e.g., United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.1976) (five minute spot checks not violative of minimization requirement); *United States v. Daly*, 535 F.2d at 442 & n. 8.

Finally, the district court correctly found that the monitoring agents' submission of

logs and tapes on a daily basis and five-day progress reports, submitted to the supervising judge, detailed the progress and results of the surveillance.

. . . . .

Monitoring ceased when agents determined that only personal, non-criminal activity was being discussed. Such intermittent monitor-ing did not commence until it was ascertained that one of the interceptees named in the order authorizing surveillance was in the room.

*United States v. Gambale*, 610 F.Supp. at 1528. The defendants do not challenge these findings, but contest the district court's legal conclusions.

regular five-day progress reports to the judge authorizing the surveillance ensured compliance with the minimization requirements of the statute. *See United States v. Gambale*, 610 F.Supp. at 1528. Such judicial oversight of surveillance practices is recognized as an ongoing check upon the reasonableness of the agents' conduct. *See, e.g., United States v. Clerkley*, 556 F.2d at 718; *United States v. Quintana*, 508 F.2d at 875.

■ Given all of these factors, we conclude that the government's monitoring techniques were not unreasonable. The district court correctly concluded that the minimization requirements of section 2518(5) did not require suppression of the tape recordings made at 98 Prince Street.[32]

#### 4. Disclosure

■ Angiulo's and Kazonis's final complaint regarding the taped conversations is that the district court erred in failing to suppress the tapes on the grounds that the government should not have been permitted to disclose or utilize conversations related to crimes other than those for which surveillance was authorized.

Upon intercepting conversations pertaining to RICO violations—crimes outside the scope of the surveillance authorizations—the government moved for an order, pursuant to 18 U.S.C. § 2517(5), permitting it to utilize that evidence to prosecute the defendants under RICO.[33] A district court judge other than the judge who presided over the defendants' motion to suppress the tapes had granted the government's motion for disclosure of evidence pertaining to the RICO offenses.

In *United States v. McKinnon*, 721 F.2d 19 (1st Cir.1983), we set forth the standards for such disclosure orders as follows:

Congress intended that evidence relating to unauthorized offenses should be given retroactive judicial approval under section 2517(5) if the original wiretap warrant was lawfully obtained, was sought in *good faith and not as a subterfuge search*, and that the communication was in fact *incidentally* intercepted during the course of a lawfully executed order.

*Id.* at 22 (quotations and citations omitted) (emphasis in original). The defendants argued in their motion to suppress, and maintain on appeal, that the government obtained its disclosure motion through subterfuge—that it always intended to obtain conversations related to RICO violations, but was constrained in applying for surveillance authorization to that end because of our decision in *Turkette*, restricting application of RICO to wholly legal enterprises —and that the conversations pertaining to the RICO offenses were not incidentally intercepted. We find no merit in these assertions; the district court's finding that the government's application for surveillance at 98 Prince Street was not subterfuge was not clearly erroneous. *See United States v. Gambale*, 610 F.Supp. at 1527.

■ In any event, even if we held that disclosure of intercepted conversations related to "other crimes" was improper and that suppression of those particular conversations was required, the defendants' convictions would stand. As the government

---

**32.** The defendants assert that at the very least the district court should have granted their motion for an evidentiary hearing on the minimization issue. Since they failed to allege sufficient specific facts that would substantiate their claim, the district court properly denied their request for an evidentiary hearing. *See United States v. Migely*, 596 F.2d 511, 513 (1st Cir.1979).

**33.** Section 2517(5) provides:
When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the or-

der of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.
Section 2517(3) is quoted *supra* note 28.

points out, all its interceptions of conversations pertaining to the offenses for which Angiulo and Kazonis were convicted were properly authorized by the district court.[34] The unauthorized interceptions that the defendants complain of were RICO–related. The defendants were not convicted on the RICO conspiracy or substantive RICO charges in the indictment, and we have concluded, *supra* Part IIIB, that the claimed "spillover" effect of the introduction of evidence concerning RICO violations at trial was harmless. Thus, even if we agreed with the defendants and excluded the conversations intercepted at 98 Prince Street concerning offenses not specified in the surveillance authorizations, we would not disturb their convictions.

E. The Government's Claim of Privilege Not to Disclose at Trial the Location of Microphones at 98 Prince Street, and Subsequent Disclosures to the Boston Globe

At trial, the defendants attempted to extract testimony from government agents concerning the location of microphones used to intercept conversations at 98 Prince Street. The government claimed that it was entitled to a qualified priviledge not to disclose that information because disclo-sure would reveal sensitive surveillance techniques and thereby hinder future criminal investigations. The trial judge recognized the asserted privilege and allowed the government to withhold the requested information. In response to the defendants' contention that without disclosure they were unable to challenge the government's asserted inferences that they participated in and heard certain conversations at 98 Prince Street, the court gave the jury the following instruction:

> Members of the jury, the defendants in this case have sought to establish the location of the microphones both at 98 Prince Street and 51 North Margin Street. The Government has elected to decline to furnish that information and claims a privilege not to do so. I have ruled that such a privilege exists; and you may draw such inferences, if any, as you may consider reasonable from the absence of evidence before you as to the specific location of the microphones.

Tr. vol. 49, p. 147.

After trial and sentencing, certain newspaper articles appeared in the *Boston Globe* concerning the investigation at 98 Prince Street. One article appearing April 5, 1987, entitled "FBI bug marked begin-

---

**34.** The government obtained authorization to intercept conversations concerning the operation of an illegal gambling business on January 9, 1981. *In the Matter of the Application of the United States for An Order Authorizing the Interception of Oral Communications,* M.B.D. 81–12 (D.Mass. Jan. 9, 1981) (order authorizing interception of oral communications). The intercepted conversations introduced against Angiulo to support the charge of illegal gambling were obtained on January 20 and 21, 1981 and in March, 1981. Thus all intercepted conversations pertaining to the offense for which Angiulo was convicted were fully authorized.

The government was also authorized to intercept conversations pertaining to conspiracy to obstruct and obstruction of state and local law enforcement on February 6, 1981, and on April 3, 1981 obtained further authorization to intercept conversations related to the federal offense of conspiring to obstruct and obstruction of justice. *In the Matter of the Application of the United States for an Order Authorizing the Continued Interception of Oral Communications,* M.B.D. 81–12 (D.Mass. Feb. 6, 1981) (order authorizing interception of oral communications); *In the Matter of the Application of the United States for an Order Authorizing the Continued Interception of Oral Communications,* M.B.D. 81–12 (D.Mass. April 3, 1981) (order authorizing interception of oral communications). The tape recordings that the government introduced into evidence against Kazonis to support the obstruction of justice charges were intercepted on March 24 and 25, 1981. Kazonis does not challenge the propriety of the disclosure order allowing the government's use of conversations related to the federal offenses of obstruction of justice, and we find no evidence in the record that those conversations were not incidentally intercepted or were purposefully obtained by subterfuge. Moreover, since they were sufficiently related to the offenses that were the subject of bona fide surveillance of 98 Prince Street, we find no fault with the disclosure order allow their use by the prosecution. *See United States v. McKinnon,* 721 F.2d at 22–23. *Cf. United States v. Smith,* 726 F.2d 852, 866 (1st Cir.1984) (government not required to obtain separate surveillance authorization in "rare case" where elements of state offense, for which surveillance authorized, paralleled federal offense for which government obtained indictment).

ning of end for Hub's Mafia leaders," reported:

> Resuming their work, [FBI agents] wired the microphones to power cells the size of fireplace logs and carefully placed them above the dropped ceiling tiles. The installers made sure that the heavy units were safely in place. Their concern was that the ceiling could collapse under their weight, and the units would crash into Angiulo's lap. If that happened, the bugging operation would collapse too. They stuffed mounds of insulation around the power units, the idea being to make it as hard as possible for anyone to find the three power packs. In this case, there would not be any hookup to a telephone or electrical line, not after the Angiulos caught wind of their past efforts to use the two utility companies to supply power for a bug and camera. They had learned their lesson not to go outside the agency. The buzzword was self-reliance. The risk of having to reenter the apartment every 30 days to replace the drained power units was determined to be less than the risk of a leak from outsiders.

*United States v. Cincotti*, 678 F.Supp. 346, 348 (D.Mass.1987). Another article on April 7, 1987 reported on a discussion between Gennaro Angiulo and Richard Gambale that took place on March 19, 1981. The article states, "Angiulo turned up the TV even louder than usual and lowered his voice. It was 9:29 a.m. and one of the two FBI microphones was hidden directly above the two men." *Id.* at 349.

Following their convictions, the defendants moved for a new trial, contending that these articles constituted newly discovered evidence that the government had asserted its privilege not to disclose the whereabouts of the microphones in bad faith, and, as a result, the defendants had been deprived of their constitutional rights to cross-examine and confront government witnesses at trial. We stayed the defendants' appeals to allow the district court the opportunity to rule on the motion for new trial. In a memorandum and order dated July 31, 1987, the district court denied that motion along with the defendants' request for an evidentiary hearing on the government's alleged bad faith. *Id.* at 347–53. Angiulo and Kazonis now assert that the district court erred in denying their motion for a new trial.

*1. The Government's Privilege of Nondisclosure*

■ In its memorandum and order the district court correctly concluded that our recent decision in *United States v. Cintolo*, 818 F.2d at 1001–03, was fully dispositive of the government's claimed privilege. In *Cintolo* we recognized the government's qualified privilege not to disclose, in the course of severed codefendant Cintolo's trial, the location of the microphones at 98 Prince Street. *Id.* at 1002. We said that the privilege could be overcome if the defendant could show an authentic and sufficient need for the information that would outweigh the government's privilege. *Id.* In evaluating the defendant's showing of need, we considered whether there were " 'adequate alternative means' " for the defendant to establish, before the jury, the same points that would be made if the government made the requested disclosures. *Id.* (quoting *United States v. Harley*, 682 F.2d 1018, 1020 (D.C.Cir.1982)).

Angiulo and Kazonis assert, as did Cintolo, that government testimony concerning the location of the microphones was necessary to their defense because the government relied on inferences that they participated in and heard conversations at 98 Prince Street when they were present there.[35] There was more than sufficient

---

**35.** Kazonis points out, for example, that the government interpreted the flow of one conversation as follows:

> Gennaro Angiulo: Drink up Skinny, you might go away tomorrow.
> William Kazonis: What reason? ... for what?

Gennaro Angiulo: Obstructing justice. Right Billy.

Kazonis's version of the same conversation, on the other hand, was as follows:

> Gennaro Angiulo: Drink up Skinny, you might go away tomorrow.
> Unknown male: What reason? ... for what?

opportunity, however, for the defendants to present their argument to the jury about doubts as to the government's ability to prove the defendants' participation in, and knowledge of, conversations that took place at 98 Prince Street. As in the *Cintolo* case, "the record reflects that the jury heard evidence regarding the size of the Prince Street apartment—evidence from which it could have concluded that not all persons present in the apartment necessarily heard every conversation (let alone, every word of every conversation)." *Id.* at 1003. In fact, the jury was taken to 98 Prince Street for a viewing of the apartment. We made clear in *Cintolo* that this viewing would be a means for a defendant to raise doubts to the jury concerning his involvement in the conversations. *Id.*

These factors persuade us that sufficient alternative means other than disclosure of the location of the government's microphones at 98 Prince Street were not only open to, but were exploited by, the defendants in this case in order to make the point that they wanted to make through use of the privileged information. *See id.* at 1003. Beyond this, the district court's instruction to the jury singling out the lack of evidence regarding the location of the microphones fully protected the points that the defendant wished to raise; the defendants retained wide latitude to paint a hypothesis about the location of the microphones that would be most favorable to their position. We therefore find no error in the district court's recognition of the government's privilege not to disclose the location of the microphones.

*2. Defendants' Rights to a New Trial*

The defendants contend that the articles in the *Boston Globe* constitute newly dis-covered evidence warranting the grant of a new trial. They assert that the government's claim of privilege was made in bad faith because the FBI's subsequent disclosure to the press of details concerning the surveillance at 98 Prince Street reveals that the location information sought by the defendants at trial was not, in fact, confidential. They argue that if the information given to the press had been provided to them at trial they would have been able to establish the precise locations of the microphones and would have had a better opportunity to rebut the government's asserted inference that they participated in incriminating conversations at 98 Prince Street.[36]

Taking into account all the defense affidavits accompanying the motion for new trial "as if there were no valid evidentiary objections to them," the district court concluded that there was little support for the defendants' contention that the government acted in bad faith in claiming its privilege at trial. *United States v. Cincotti*, 678 F.Supp. at 350. It pointed out that the *Boston Globe's* reports about the location of the microphones over the heads of Gennaro Angiulo and Gambale were just as likely speculations based on journalistic license as they were reports of facts obtained from FBI sources. The court concluded, moreover, that even if the defendants showed bad faith on the part of the government, they failed to show that they were prejudiced or harmed by not having available the "newly discovered evidence" gleaned from the Boston Globe articles at trial.

Motions for new trials are directed to the sound discretion of the trial court. *E.g., United States v. Rivera–Sola*, 713 F.2d 866, 874 (1st Cir.1983); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980). Keeping in mind that such a remedy is

---

Gennaro Angiulo: Obstructing justice. Right Billy.
Unknown male: ...
William Kazonis: Who they talking to?
Angiulo presents no separate arguments for need in relation to his own case, but simply adopts, by reference, the arguments made by Kazonis on this point.

**36.** The defendants argue that since the *Boston Globe* reported that on March 19, 1981 the mi-crophones were directly over the heads of Gennaro Angiulo and Richard Gambale, the FBI must have disclosed the location of the microphones to the press. They contend that if they had known the information reported in that article at the time of trial, they could have questioned Gennaro Angiulo at trial about where he was standing during his discussion with Gambale on that day and thereby proved the precise location of the microphones.

sparingly used, we review the district court's denial of the defendants' motion for abuse of discretion. *Id.* A district court is well within its discretion in denying a defendant's motion for a new trial based on newly discovered evidence if the defendant has failed to demonstrate that access to such evidence would probably result in an acquittal. *Id.* And any factfinding on the part of the district court will not be disturbed unless clearly erroneous. *Id.*

We find that the district court was well within its discretion in denying the defendants' motion for a new trial. The defendants failed to show that their access to the information in the *Boston Globe* articles would have changed the jury's verdicts. Indeed, given the options available to, and exploited by, the defendants to make their point to the jury about their possible lack of participation in the incriminating conversations at 98 Prince Street and the district court's instruction to the jury about the lack of evidence concerning the location of the microphones, the defendants can hardly assert that they would have benefitted from knowledge even of the precise locations of the microphones at trial. Without that evidence they could exploit, to the fullest, hypotheses about the locations that would raise reasonable doubts in the jurors minds concerning their participation in those conversations.

We affirm the district court's denial of the defendants' motion for a new trial.

F. The Government's Use of Peremptory Challenges

The final argument jointly asserted by Angiulo and Kazonis is that the government's use of peremptory challenges to strike blacks and Italian–Americans from the jury violated their constitutional rights to equal protection according to the Supreme Court's pronouncements in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The prosecution used 2 of its 7 peremptory challenges to eliminate 2 out of 4 blacks from the 31 member jury venire. It also used 4 of its peremptory challenges to eliminate 4 out of 7 of the potential jurors who had Italian–American sounding names. The defendants objected to the government's use of peremptory challenges, claiming that it was excluding jurors on account of race and national origin. The district judge then asked the government to explain its use of peremptories, and found that the government had articulated sufficient non-racial and non-ethnic reasons for its challenges. The defendants now argue that they had established a *prima facie* case of discriminatory use of peremptory challenges by the government, and that the district court erred in concluding that the government's explanation was sufficient to overcome their equal protection claims.

We find no merit in the defendants' assertions. First, as the government points out, to make out a *prima facie* case of purposeful discrimination under *Batson,* the defendants must be members of the ethnic or racial group that they contend was discriminated against by the government. Since Angiulo and Kazonis are not black, they cannot complain about the government's peremptory challenges to black members of the jury venire. *Batson v. Kentucky,* 106 S.Ct. at 1723; *United States v. Vaccaro,* 816 F.2d 443, 457 (9th Cir.1987). Second, "[b]ecause appellants did not even attempt to show that Italian–Americans either have been or are currently subjected to discriminatory treatment, their claim fails to meet the initial requirement under *Batson* that the defendant show his or her membership in a 'cognizable' group." *United States v. Bucci,* 839 F.2d 825, 833 (1st Cir.1988). For these reasons, the district court correctly rejected the defendants' equal protection claim.

Beyond this, even assuming that the defendants had established their *prima facie* case under *Batson,* the district court found "objectively reasonable" the government's proffered non-discriminatory reasons for striking individuals with Italian–American sounding names from the jury venire. In *Batson,* the Supreme Court said that to overcome a defendant's *prima facie* showing of discrimination the government must come forward with a "neutral explanation"

for its use of peremptory challenges. Here the government provided sufficient neutral explanations for eliminating jurors with Italian–American sounding names.[37] The district court's finding in this regard, which is "entitled to appropriate deference by a reviewing court," *Batson v. Kentucky*, 106 S.Ct. at 1724 n. 21, is not clearly erroneous.

We therefore conclude that the district court properly overruled the defendants' objections to the government's use of peremptory challenges.[38]

### IV.

We find no merit in arguments separately asserted by Angiulo challenging the admissibility of expert testimony of the general counsel of the Massachusetts State Lottery Commission regarding the requirements of Massachusetts gambling laws and the sufficiency of evidence for his illegal gambling conviction. His challenge to the expert witness testimony was not preserved for appellate review and we find no plain error. *See United States v. Williams*, 809 F.2d 75, 82 (1st Cir.1986). Having reviewed the evidence in the light most favorable to the government, we conclude that the jury properly could have found Angiulo guilty beyond a reasonable doubt for operating an illegal gambling business.

*Affirmed.*

---

**37.** Its reasons were as follows: one juror had provided false or misleading statements in responses to the government's questionaire; another was observed as answering questions in a "flip" manner; the third was struck because of her recent move to Boston and care of a small child, which the government thought would cause her distractions; the fourth was from a small town where a number of the defendants and their cousins resided.

**38.** We reach the same conclusion with regard to the defendants' belatedly asserted argument that the government's exercise of peremptory challenges violated their rights "to an impartial jury" under the Sixth Amendment. Even assuming, without deciding, that the Sixth Amendment applied to such a case, *but cf. Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986) (declining to extend Sixth Amendment "fair cross-section requirement" to selection of petit juries), the defendants' failure to show that the eliminated jurors with Italian–American sounding names were, in fact, members of an Italian–American ethnic group within the community from which they were drawn is fatal to their claim. *United States v. Bucci*, 839 F.2d at 834; *see United States v. Sgro*, 816 F.2d 30, 33 & n. 2 (1st Cir.1987).