**Lydia LIBERTAD, et al., Plaintiffs,**

v.

**Father Patrick WELCH,
et al., Defendants.**

**Civ. No. 93–1017 (HL).**

United States District Court,
D. Puerto Rico.

Nov. 1, 1993.

Judith Berkan, Rio Piedras, PR, for Lydia Libertad, Grupo Pro Derechos Reproductivos, Rosa Caceres, Oficinas Medicas.

Nora Vargas–Acosta, Rio Piedras, PR, for Mary Rivera, Sociedad Instituto Gineco–Quirurgico.

Peter Berkowitz, Rio Piedras, PR, Wanda I. Resto–Torres, Hato Rey, PR, for Ana E. Gonzalez–Davila, Rafael Castro, Dr., Ladies Medical Center.

Miguel A. Gimenez–Munoz, Cordero, Miranda & Pinto, San Juan, PR, for Patrick Welch and Norman Weslin.

Jorge I. Peirats, Pietrantoni, Mendez & Alvarez, Hato Rey, PR, for Colegio Notre Dame and Ruben Moley.

## OPINION AND ORDER

LAFFITTE, District Judge.

## I.

## INTRODUCTION

### A. *Procedural History*

On January 8, 1993, plaintiffs filed a motion for a temporary restraining order seeking to enjoin defendants from using "unlawful force, blockades, harassment, intimidation and physical obstruction" to prevent women from entering clinics in the San Juan area which provide abortion services. The Court denied the motion for a temporary restraining order but scheduled a hearing on plaintiffs' supplemental request for a preliminary injunction.

A preliminary injunction hearing was held from February 4 through February 9, 1993. Extensive testimonial and documentary evidence was presented. At the close of the hearing, the Court ordered the parties to submit post-hearing briefs on the various legal issues raised by the case. Having carefully reviewed the submissions of the parties, the evidence presented and the applicable law, the Court is now ready to rule.

This is an action for declaratory and injunctive relief, and for damages, arising out of a series of anti-abortion demonstrations and blockades which took place at family planning clinics located in the San Juan Metropolitan area. What this case is not about is whether women should or should not have the right to seek abortions, a matter fraught with constitutional, social and moral ramifications. Nor is this case about the defendants' right to make public their opposition to abortion. Rather, this lawsuit was instituted to enjoin what plaintiffs perceive as illegal and tortious activity by defendants that goes beyond their constitutional rights of speech and protest. According to plaintiffs, defendants have harassed and intimidated clinic patients, defaced clinic property, blocked parking lot and building entrances, created disturbances and public nuisances, and burdened law enforcement in Puerto Rico. These are the activities which plaintiffs seek to enjoin and for which they seek damages.

### B. *The Parties*

Plaintiffs have brought this suit as a class action in representation of women who have or will seek family planning services here in Puerto Rico. The named plaintiffs include a reproductive rights organization [1], representatives of women seeking reproductive services [2], and the staff and operators of the

---

1. This organization is called Grupo Pro Derechos Reproductivos.

2. These plaintiffs were fictitiously named Lydia Libertad and Emilia Emancipacion to protect their privacy.

clinics which render such services[3].

The defendants in this case are individuals and organizations who vigorously oppose abortion and have coordinated anti-abortion demonstrations. From 1987 until at least January 16, 1993, defendant Father Patrick Welch held the position of executive director of the Notre Dame School and rector of the Cathedral of Caguas. During this period, Father Welch was also the Superior of the Redemptorist Community of Caguas and an organizer and spiritual leader of an anti-abortion group called the Pro–Life Rescue Team.

Defendant Father Norman U. Weslin is a missionary of the Catholic Church and founder of the Sacrificial Lambs of Christ (the "Lambs"). Also named as defendants are Donald Treshman and Ed Martin, represen-

tatives of Rescue America, an anti-abortion organization based in the United States. Rescue America is also named as a defendant.[4]

Additionally, plaintiff's have joined the Colegio Catolico Notre Dame ("CCND") and Father Ruben Moley, General Director of the Redemptorist Order of the Catholic Church in Puerto Rico. Carlos Sanchez, leader of the group Pro–Vida, is also a defendant in this action.[5]

## C. The Claims

Plaintiffs' federal claims are based on the "hindrance clause" of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3) and the Racketeer Influenced and Corrupt Organization Act ("RICO"), 19 U.S.C. § 1961 *et seq.* (1984).[6] Plaintiffs also invoke the Court's

---

3. Plaintiff Rosa Caceres is the Clinic Administrator at the Women's Metropolitan Clinic in Rio Piedras, Puerto Rico. Plaintiff Mary Rivera is the Clinic Supervisor and Director of Counseling at the Clinica Gineco–Quirurgica y de Planificacion Familiar. This clinic is one of two health care facilities owned and operated by plaintiff Sociedad Instituto Gineco–Quirurgico. Plaintiffs Ana E. Gonzalez Davila and Dr. Rafael E. Castro De Jesus are respectively the Administrator and Medical Director of the Ladies Medical Center, also a plaintiff in its own right.

4. On February 9, 1993, counsel for defendants Welch and Weslin, in open court, moved for dismissal of the complaint as to defendant Sacrificial Lambs of Christ due to defective service. The same motion was made as to defendant Rescue America. The Court examined the record and found that service as to these defendants was defective because the summons failed to state the name of the person served. Plaintiff was granted time to check with the United States Marshall's Office regarding the service of these defendants. Since that time plaintiffs have not raised the issue again with the Court. Thus, the Court can only assume that plaintiffs concede that defendants Sacrificial Lambs of Christ and Rescue America were improperly served. Accordingly, the Court hereby grants the motions to dismiss these defendants for improper service.

5. Monsignor Enrique Hernandez Rivera, Bishop of the Dioceses of Caguas was also named as a defendant. On February 4, 1993, the Court granted said defendant's oral motion to dismiss for failure to state a claim, which motion was unopposed by plaintiffs on the condition that the dismissal be without prejudice. *See,* Minutes of Proceedings for February 4, 1993, docket no. 32. Subsequently, judgment was entered dismissing

without prejudice all claims against the Bishop of Caguas. *See,* docket no. 44.

6. Plaintiffs filed their initial complaint on January 8, 1993. In response to the Supreme Court's ruling in *Jayne Bray v. Alexandria Women's Health Clinic,* — U.S. —, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) that the first clause of § 1985(3) does not provide a federal cause of action against persons obstructing access to abortion clinics, plaintiffs sought leave to amend the complaint to clarify their "hindrance clause" claim. Despite this unfavorable decision, plaintiffs did not altogether drop their claims based on the first clause of § 1985(3). Instead, they sought to present evidence that defendants' opposition to women's choice on the issue of abortion rests on a foundation of discriminatory animus towards women as a class. Even if the Court were to find that the evidence presented supported this inference, their claim would fail for another reason.

A "deprivation clause" claim under § 1985(3) requires an intent to deprive persons of a right guaranteed against private encroachment. *Bray,* — U.S. at —, 113 S.Ct. at 762. No such intent was established here. In at least some contexts the right to interstate travel has been held to be constitutionally protected against private interference. *Id.* Even if plaintiffs had established that substantial numbers of women travelled interstate to obtain abortions in Puerto Rico, which they have not, and that consequently their right to interstate travel had been incidentally affected by defendant's actions, this would still not be enough. The impairment of the right to interstate travel must be a "conscious objective of the enterprise." *Id.* Plaintiffs have shown no connection whatsoever between defendants' opposition to abortion and womens' right to interstate travel. Furthermore, plaintiffs

pendent jurisdiction over claims arising under the Constitution and laws of the Commonwealth of Puerto Rico.

## II.

## FACTUAL BACKGROUND

On five separate occasions the clinics which are parties to this suit were blockaded by defendants: September 26, 1992, September 28, 1992, December 17, 1992, December 24, 1992 and January 8, 1993. These demonstrations are referred to as "rescues" by defendants. Typically, rescues begin before the clinics open. (Tr. 380) Defendants and those acting with them block clinic entrances and parking lots. Difficult-to-remove stickers of fetuses are affixed to clinic walls and entrances in the form of Christian crosses or in the form of the word "vida" or "life" in Spanish. (Tr. 173, 266–67, 279, 339). Litter is strewn on clinic grounds. (Tr. 173). Clinic walls are dirtied and defaced (e.g., the word "asesina" or "murderer" in Spanish has been written on clinic walls), forcing clinics to repaint their facilities. (Tr. 279). Clinic gates and entrances are padlocked or damaged to prevent the entry of patients and personnel. (Tr. 186, 274, 365). Decorative plants are trampled. (Tr. 279).

Defendants and those acting with them blockade clinic facilities by positioning themselves in front of clinic entrances and parking areas and locking their arms together. (Tr. 187–89, 268–69, 336, 411). Patients are videotaped or photographed as they enter and leave clinics. (Tr. 212, 424, 445). Slogans in strong language are shouted through megaphones. (Tr. 271).

Defendant Welch and some of the children who participate in the blockades have entered clinic waiting rooms and have refused to leave at the behest of clinic employees. (Tr. 186–88). Patients with appointments have left at the sight of Welch in the waiting room. (Tr. 188). Upon one occasion, defendant Welch shoved Clinic Administrator Ana

Gonzalez from the entrance of the clinic through the waiting room into the back office of the Ladies Medical Center, where she remained trapped for a number of hours. (Tr. 177, 179). The record also shows that defendants and those acting with them shout insults to patients and employees of the clinics. (Tr. 424, 431, 435–38, 441).

Plaintiffs allege that with the arrival of representatives from stateside anti-abortion groups the defendants' blockade tactics became more aggressive. For instances, school buses from the Colegio of Notre Dame were parked in front of clinic entrances (Tr. 432–433), the number of participants increased, and a clinic entrance was chain-locked. (Tr. 274, 365).

The record also indicates that clinics face time-consuming, expensive repairs after each blockade (Tr. 274–75), including the expense of hiring security guards. (Tr. 213–214). Similarly, the evidence shows that the Commonwealth police expend considerable resources in responding to blockade situations, at times deploying upwards of sixty officers to remove demonstrators. (Tr. 353–56, 204–05). Demonstrators use various tactics which slow the arrest process and "buy time" for the "unborn" (Tr. 205–06, 365), including going limp (Tr. 652–53), lying down on the ground (Tr. 205) and locking arms.

## III.

## PRELIMINARY INJUNCTION STANDARD

■ The standard for reviewing a request for a preliminary injunction is well-established.

As is well known, a district court may grant a preliminary injunction if it finds that (1) without it the plaintiff will suffer irreparable injury, (2) the injury outweighs the harm the injunction will cause the defendant, (3) the plaintiff has shown a likelihood of success on the merits, and (4) the

claim under the "deprivation clause" fails because plaintiffs have not and cannot show that the right to abortion, or the more general right to privacy, are rights guaranteed against private infringement, a requirement under *Bray*. *Id.* at ——, 113 S.Ct. at 764. *Bray* clearly indicates

that the only such rights recognized to date are the Thirteenth Amendment rights to be free from involuntary servitude and to interstate travel. *Id.* Thus, the Court finds that plaintiffs' have failed to demonstrate a likelihood of success on the merits on their "deprivation clause" claim.

injunction is consistent with "the public interest."

*United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir.1987) (quoting *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981)). While the four requirements are generally considered together, the Court will focus its attention on the requirement of success on the merits, for this threshold inquiry is "critical to the appropriateness of an award of injunctive relief." *See, Proyecto Nova v. Administration of Juvenile Institutions*, No. 91–1729 (HL) (D.P.R. Aug. 27, 1991) (order denying preliminary injunction). Plaintiffs seek relief under the "hindrance clause" of 42 U.S.C. § 1985(3), under RICO, and under the Constitution and laws of the Commonwealth of Puerto Rico. The Court will address each claim in turn.

## IV.

## DISCUSSION

### A. RICO: Section 1962(c) Claims [7]

■ Plaintiffs allege that defendants have conspired to, and have conducted or participated in the conduct of an enterprise through a pattern of racketeering activities consisting of several anti-abortion demonstrations and blockades with the intent to extort plaintiffs' property interest in their business and practice of women's health care, all in violation of 18 U.S.C. § 1962(c) and (d). 18 U.S.C. § 1962(c) provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a claim under section 1962(c), a plaintiff must establish each of the following four elements required by the statute: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir.1991) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). In reviewing the evidence presented at the preliminary injunction hearing, together with the briefs and pleadings submitted to the Court, we have discerned certain flaws in plaintiffs' case which we believe diminish the likelihood of their ultimate success on the merits.

### 1. Failure to Demonstrate the Existence of an Enterprise

■ Plaintiffs have espoused alternate enterprise theories in this case. At paragraph 43 of the amended complaint, plaintiffs write:

The organizations Pro–Life Rescue Team, Rescue America and the Sacrificial Lambs of Christ are each an "enterprise" as defined in 1961(4) of RICO. At all times relevant to the events alleged herein, the defendants were associated with these enterprises, and in the alternative were an association-in-fact of the Pro–Life Rescue Team, Rescue America and/or the Sacrificial Lambs of Christ, all of which enterprises engaged in and the activities of which affected interstate commerce.

Similarly, in their Post–Trial Brief at page 19, plaintiffs write:

within the ambit of RICO, the Seventh Circuit in *Scheidler* joined the Second and the Eighth circuits. *See, United States v. Ivic*, 700 F.2d 51, 59–65 (2d Cir.1983); *United States v. Flynn*, 852 F.2d 1045, 1052 (8th Cir.1988), *cert. denied*, 488 U.S. 974, 109 S.Ct. 511, 102 L.Ed.2d 546 (1988). The First Circuit has not been asked to rule on this issue.

While the Court acknowledges that the *Scheidler* case is pending before the Supreme Court, the Court finds that plaintiffs' RICO claim is deficient for reasons that do not implicate the issue pending therein. The viability of plaintiffs' RICO claims can be determined without ruling on the question of economic motive.

---

7. At the end of the 1992–1993 term, the U.S. Supreme Court granted review in *National Organization for Women, Inc. v. Scheidler*, 765 F.Supp. 937 (N.D.Ill.1991), *aff'd*, 968 F.2d 612 (7th Cir.) to resolve the issue of whether an economic motive is necessary to sustain a section 1962 RICO claim. Prior to *Scheidler*, the only circuit court decision holding that it was unnecessary to demonstrate a financial motive to sustain a RICO cause of action was *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1347–48 (3d Cir.1989), *cert. denied*, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). In concluding that non-economic crimes committed in furtherance of non-economic motives were not

Defendants Pro-life Rescue Team (PRLT), Rescue America (RA), and the Sacrificial Lambs of Christ (Lambs), are each an "enterprise" as that term is defined in § 1961(4) of RICO. At all times relevant to the events alleged herein, the defendants were associated with the Pro–Life Rescue Team enterprise and the Rescue America enterprise. It is also appropriate to describe the defendants as an association-in-fact.

Thus, one theory posits Rescue America, the Sacrificial Lambs of Christ and the Pro–Life Rescue Team as the enterprises with which the named defendants are allegedly associated. The alternate theory proposes the existence of an association-in-fact enterprise comprised of the named defendants and the three aforementioned organizations. The definition of "enterprise" contained in section 1961(4) establishes only two basic categories of associations: legal entities and associations-in-fact. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Plaintiffs have neither pleaded nor presented evidence that Rescue America, the Sacrificial Lambs of Christ, or the Pro–Life Rescue Team have legal status as corporations, partnerships or associations recognized by state law. Hence, under either enterprise theory, these three organizations must be considered to fall under the "group of individuals associated in fact though not a legal entity" portion of section 1961(4). For analytical purposes, then, plaintiffs' enterprise theories must be tested by the standards for establishing association-in-fact enterprises.

In *Turkette*, the Supreme Court wrote:

In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts defined by statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). **The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit** [emphasis ours]. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. **The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages** [emphasis ours].

*Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528–29. The "ongoing organization" requirement is satisfied by showing "that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual." *United States v. Riccobene*, 709 F.2d 214, 222 (3rd Cir.1983). In other words, "[t]here must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad-hoc, basis." *Id.* The second necessary element of an association-in-fact enterprise under RICO is that "the various associates function as a continuing unit." *Riccobene*, 709 F.2d at 223 (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528). Thus, "each person [must] perform a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization." *Id.* The third and final element of an enterprise under RICO is that the organization must be "an entity separate and apart from the pattern of activity in which it engages." *Id.* at 223 (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528). Some courts have interpreted this requirement to mean that "plaintiff must plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts." *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir.1989); *Rodriguez v. Banco Central*, 777 F.Supp. 1043, 1054–55 (D.P.R.1991) ("plaintiff ... must also prove the existence of the enterprise as a functioning unit with a structure apart from the mere coming together of

the participants for purposes of committing the criminal predicate acts").[8]

With respect to plaintiffs' first theory, the Court finds that plaintiffs have failed to show that the organizations Rescue America, the Sacrificial Lambs of Christ and Pro–Life Rescue Team exist for purposes other than to commit predicate acts. The evidence as to the activities of these organizations uniformly confirmed that their sole purpose is to stop the practice of abortion through demonstrations and blockades. The was no evidence of these groups having an organizational structure beyond that which is necessary simply to commit the alleged racketeering acts. Accordingly, these groups cannot qualify as enterprises for the purposes of sections 1962(c) and (d).

As to plaintiffs' theory that the named defendants, together with the three anti-abortion groups, formed an association-in-fact enterprise, again, the Court finds the necessary evidence lacking. First, there was no evidence of an on-going organization beyond that which is necessary to commit the predicate acts themselves. Defendants Weslin, Martin and Treshman were in Puerto Rico only for the January 8, 1993 blockade. Although these defendants may have planned to attend that particular demonstration, there was no evidence that the defendants formed a structure, hierarchical or otherwise, for the making of decisions. Rather, most of the impulse to coordinate the joint rescue seems to have emanated from Welch himself, who invited the other participants to Puerto Rico. This is a far cry from the other defen-

dants planning to form an on-going association with Welch requiring their participation and planning efforts on a continued basis. Furthermore, there was no evidence that the defendants created a mechanism for controlling and directing the affairs of the alleged association-in-fact on an on-going basis. We reiterate that Welch all along seemed to be the driving force behind the coming together of these like-minded individuals. There is nothing in the record to suggest that any other defendant took a leadership role in terms of planning and organization. Surely, certain defendants may have provided spiritual leadership to demonstrators, but no system to allocate managerial powers and responsibilities was even contemplated much less actually implemented. The record shows that these defendants came together for one clinic blockade in Puerto Rico. No evidence emerged that Weslin, Martin or Treshman plan to return to conduct further joint rescues, nor that they plan to continue assisting Welch in his efforts here in Puerto Rico.

Another missing element in plaintiffs case is evidence of the defendants having been assigned or having taken on specific roles consistent with the overall structure of the organization. First of all, the record is devoid of evidence as to the actual structure of the Rescue America and the Pro–Life Rescue Team. As to the Sacrificial Lambs of Christ, the testimony of Father Weslin indicates that the group maintains no real structure, simply a two-tiered division based on the amount of

---

**8.** A separate though related requirement is that "under § 1962(c) the 'person' alleged to be engaged in a racketeering activity (the defendant, that is) must be an entity distinct from the 'enterprise'…." *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988). In other words, under § 1962(c) the enterprise is not liable, for "[i]t is only a person, or one associated with an enterprise, not the enterprise itself, who can violate the provisions of the section." *Odishelidze*, 853 F.2d at 24. Plaintiffs have named Rescue America and the Sacrificial Lambs of Christ as defendants in this action. (*See*, Amended Complaint, filed 2–2–93). However, they also allege that Rescue America and the Sacrificial Lambs of Christ are "enterprises." The First Circuit has consistently held that "the same entity cannot do double duty as both the RICO defendant and the RICO enterprise." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir.

1991). Thus, "[t]he enterprise, even if itself blameworthy, cannot also be answerable as a defendant under section 1962(c)." *Id.* at 45. Since the amended complaint alleges two enterprise theories that both posit Rescue America and the Sacrificial Lambs of Christ as part of the enterprise, and the amended complaint does not charge that Rescue America and the Sacrificial Lambs of Christ conducted or participated in the conduct of an allegedly unlawful enterprise of which they are not a part, no claim has been stated against these groups. *See, e.g., Arzuaga–Collazo v. Oriental Fed. Sav. Bank*, 913 F.2d 5, 6 (1st Cir.1990). Thus, even if the Court had not dismissed the claims against these defendants for improper service, plaintiffs claims against Rescue America and the Sacrificial Lambs of Christ exhibit little probability of success on the merits because they blur the essential distinction between a "person" and an "enterprise."

time individuals are able to dedicate to the pro-life cause. Second, there was no evidence of the defendants, Welch aside, having performed specific functions. In the main defendants Weslin, Martin, Treshman and Sanchez seem to have taken part in the blockades on an equal footing with the other demonstrators. Their presence may have served to galvanize the spiritual resolve of the crowd, but this cannot be equated with taking on managerial responsibility or performing some lesser assigned task on a continued basis within the context of on-going organization.

Finally, plaintiffs have failed to show the existence of an organization or structure beyond that which is necessary simply to commit the alleged racketeering acts. Plaintiffs claim that defendants have attended meetings, issued press releases in anticipation of actual demonstrations, prepared banners and posters, arranged for transportation, and communicated with each other by phone to coordinate joint rescues. There is no doubt that defendants Weslin, Martin, Treshman and Sanchez joined Welch and his followers in demonstrating at the Clinica Gineco–Quirurgica. Likewise, there is no question that this activity required a certain degree of planning and coordination. However, what plaintiffs cannot show is that this activity emanated from an association or organization whose structure would facilitate the pursuit of other activities. In other words, there is complete parity between the alleged association in this case and its challenged activities or conduct. The association-in-fact alleged to exist between the named defendants and the organizations Rescue America, Sacrificial Lambs of Christ, and Pro–Life Rescue Team can only be defined by what it did, and not by what it is. *See, Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir.1990) ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does."). What the alleged enterprise

did was come together for a short-lived, clamorous expression of its views on abortion. After that, it dissipated, its constituent parts going their own separate ways. What remains, perhaps, are the effects of that expression, but not the ephemeral gathering which created them. Accordingly, the Court finds that plaintiffs have failed to demonstrate a likelihood of success in establishing either of their two theories of enterprise.

### 2. *Failure to Show a Pattern of Racketeering Activity*

■ Plaintiffs have also failed to demonstrate that defendants engaged in a pattern of racketeering activity. To prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a continued threat of criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).[9] For analytic purposes, the court will discuss these constituent elements of RICO's pattern requirement separately.

### a. *Relatedness*

"A plaintiff establishes that predicate acts are related by demonstrating that they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990) (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2901). In this case, there is little doubt that the five alleged predicates are related.

### b. *Continuity*

■ Under *H.J. Inc.*, two methods are available to determine if a set of predicate acts has achieved the continuity necessary to bolster a RICO claim: "to establish continuity, a plaintiff must demonstrate that the related predicate acts 'amount to or pose a threat of continued criminal activity.' "

---

9. As the Court noted in *H.J. Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899, "the section of [RICO] headed "definitions," 18 U.S.C. § 1961 (1982 ed. ans Sopp. V), does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *See also, Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, n. 14, 105 S.Ct. 3275, 3285, n. 14, 87 L.Ed.2d 346 (1985).

*Fleet,* 893 F.2d at 446 (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2901).

> Under the "amount[ing] to" approach:
> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a *substantial period of time.* Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." (emphasis added)

*Fleet,* 893 F.2d at 446 (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902). "Because RICO was intended by Congress to apply only to enduring criminal conduct, '[p]redicate acts extending over a few weeks or months ... do not satisfy this requirement.'" *Feinstein,* 942 F.2d at 45 (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902.) In *Bigay v. Taco Maker, Inc.,* 730 F.Supp. 463 (D.P.R. 1990), the court found such continuity lacking where the predicate acts were confined to a period of eight months and in *Eastern Corporate Fed. Cred. Union v. Peat, Marwick, Etc.,* 639 F.Supp. 1532 (D.Mass.1986) three acts of mail fraud over a two month period did not establish continuity.

"Under the 'threat' approach, however, even where the predicate acts occur in a narrow time frame and suit is brought before the pattern has taken definitive shape, the requirement can still be satisfied by demonstrating a realistic prospect of continuity over an open-ended period yet to come." *Feinstein,* 942 F.2d at 45. "Predicate acts pose a *threat* of continued criminal activity when they constitute 'past conduct that by its nature projects into the future with a threat of repetition'" *Fleet,* 893 F.2d at 447 (quoting

*H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902). Plaintiff may demonstrate such a threat by proving that "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit," *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; by showing that the predicate acts are a "regular way of conducting defendant's ongoing legitimate business," *Id.* at 243, 109 S.Ct. at 2902, *see also, Fleet,* 893 F.2d at 447; or, by establishing that "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902.

In this case, five instances of racketeering activity have been alleged over a three and one-half month period. Clearly this is too short a period to establish closed-end continuity. Furthermore, the very fact that plaintiffs are seeking prospective injunctive relief against possible future activities by defendants demonstrates that they are concerned with the threat of repetition.

Nevertheless, plaintiffs have been unable to show a realistic prospect that the activity challenged in this suit will resume with enduring effects. First, there is nothing about the challenged conduct that by its nature projects into the future with a threat of repetition. The January 8, 1993 blockade involving all the defendants to this action was a special gathering, an event which is unlikely to be repeated. Father Weslin has admitted that his process of discernment is presently leading him away from human society to retreat in intensive prayer. Father Welch has stated that he will be leaving Puerto Rico shortly. Defendants Martin and Treshman left Puerto Rico shortly after the January blockade with no immediate plans to return.[10]

---

10. Plaintiffs will no doubt argue that shortly after the hearing in this case concluded other demonstrations took place at the clinics involved in this action underscoring the need for preliminary protective measures. *See,* Pltfs.' "Motion Requesting Further Hearing," docket no. 38, filed 2–16–93, and "Second Motion Requesting Further Hearing," docket no. 39, filed 2–19–93. However, the Court does not agree. First, neither defendant Welch, nor any of the defendants in this action were present at the February 13, 1993 demonstration. Furthermore, it is apparent from the sworn statement of Dr. Rafael Bernabe that the protesters did not block access to clinics on that date. The activity, in fact, seems to have been limited to chanting slogans and carrying placards. Dr. Bernabe states that he observed some protesters in the parking lot of one of the clinics but he does not say that access was blocked. Furthermore, while he states that he observed an individual by the name of Laura Guerrero enter the private property of a clinic, he did not observe her physically or verbally harass any clinic patient or staff member.

With respect to the events of February 18, 1993, two sworn statements have been submitted

**30**

Likewise, plaintiffs have not shown that the predicate acts involved in this case are a regular way of conducting a defendant's on-going legitimate business or that they can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. The group of individuals who came together on January 8, 1993 to make public their opposition to abortion has long since dispersed. That group was neither a legitimate business nor a long-term criminal association. Its very nature was temporary, as it was composed of individuals who do not live in Puerto Rico and came here only to participate in a clinic blockade. In as much as plaintiffs have not shown a realistic prospect that the defendants in this case will resume the challenged conduct, or that the challenged conduct extended over a significant period of time, the Court finds that they have not made out the element of continuity essential in proving a RICO pattern.[11]

which confirm that Father Welch was, in fact, present at the Clinica Gineco–Quirurgica on that date. The sworn statements attest to the fact that Father Welch was directing the activities of a certain "Mark Clemens," who was engaged in videotaping patients and staff members of the clinic. Both statements indicate that Father Welch and his companion were outside the clinic. The only sense in which patients' access to the clinics was impeded was through the presence of Welch and the fear of being videotaped. While the Court does not doubt the genuineness of these sworn statements, the fact of the matter is that the events of February 13 and 18, 1993 are a far cry from the kinds of demonstrations alleged in the complaint. Not only were none of the defendants present on February 13, but the clinic property was not damaged and entrances were not blocked. Similarly, with respect to the events of February 18, 1993, a subjective fear of encountering Father Welch cannot be equated with actual physical obstruction and property damage. Accordingly, the Court finds that these events do not foretell the continuation of the tactics observed at the January 8, 1993 blockade and the on-going involvement of the defendants named in this action.

11. The Court also finds that, with the exception of Father Welch, the activities of the defendants in this action fail to meet the standard of actionable "conduct" under RICO. In *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), the Supreme Court held that " 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." There is simply no evidence in the record to suggest that defendants Moley, Weslin, Martin, Treshman, Sanchez or Colegio Catolico de Notre Dame participated in the operation or management of any of the enterprises alleged by the plaintiffs. Plaintiffs claim that Father Moley had knowledge of, and the ability to control and direct the activities of his subordinate Father Welch. Plaintiffs claim that "[b]y implicitly and/or explicitly authorizing Welch's use of Redemptorist school funds, property, prestige and community, defendant Moley ratified and lent the mantle of his authority to the blockades and thus had, at the very least, *some* part in the

direction and course of the enterprise's affairs." [emphasis in original] (Pltf's Post–Trial Brief, p. 28). This assertion is little more than an interpretation of Father Moley's silence and inaction which is unsupported by the record. There is no evidence that Father Moley took part in any demonstration or blockade or participated in the organization or planning of these events. Furthermore, Father Welch testified that he did not ask Father Moley for his permission to organize anti-abortion demonstrations because he was acting on his conscience as an individual and not as a representative of the Redemptorist Fathers or any other institution. (Tr. 593). The record shows that Father Moley told Father Welch to "watch out" and "follow your conscience, but ... seek good counsel and get good advice so that your conscience be well-formed." (Tr. 593). Thus, not only did Father Moley lack the authority to control Father Welch's acts of individual conscience, but his advice was at best, guarded, and by no means an whole-hearted endorsement of Welch's activities. The Court finds that Father Moley's words of advice to Father Welch, together with what plaintiffs perceive as his failure to censure or halt Father Welch's activities do not rise to the level of participation in the operation and management of an enterprise.

Similarly, there is no evidence linking defendant Sanchez to the purchase of stickers, and other paraphernalia, to the hiring of drivers or coordination of transportation to demonstrations, to the housing of Rescue America Representatives, to meetings at the Notre Dame school or the publication of press releases. He was simply invited to participate in certain demonstrations (two, in number) and did so based on the belief he shares with Father Welch that abortion is a sin. The same can be said of defendants Weslin, Martin and Treshman. At most, the actions of these four defendants may be characterized as "aiding and abetting", a term which encompasses "all assistance rendered by words, acts, encouragement support, or presence," but which falls short of actionable participation in the direction of the alleged enterprise. *Reves,* —— U.S. at ——, 113 S.Ct. at 1170 (quoting Black Law Dictionary 68 (6th Ed.1990)). The evidence that the Colegio Catolico de Notre Dame participated in the operation and management of the enterprise's affairs is just as scant. The only

**B. RICO: Section 1962(d) Claims**

 18 U.S.C. § 1962(d) provides in relevant part:

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

A plaintiff has made out the elements of a conspiracy charge under RICO if he shows "(1) the existence of an 'enterprise,' (2) that the defendant knowingly joined the enterprise and (3) that the defendant agreed to commit, or in fact committed, two or more specified predicate crimes as part of his participation in the affairs of the enterprise." *United States v. Angiulo*, 847 F.2d 956, 964 (1st Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988); *see also*, *United States v. Rodriguez Cortes*, 949 F.2d 532, 538 (1st Cir.1991) ("In order to prove that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent; intent to agree and intent to commit the substantive offense."). These requirements have been elaborated to protect those who might otherwise be convicted or found liable through guilt by association. *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981).

In applying this standard to the facts of this case, it becomes clear that plaintiffs failure to establish the existence of an enterprise is no less damaging to their conspiracy claim as it is to their section 1962(c) claim. Here, the conspiracy charge rests on the same allegations and proof that plaintiffs advance with respect to their section 1962(c) claim. As plaintiffs point out, there is certainly evidence that Father Welch communicated with defendants Weslin, Martin, Treshman and Sanchez concerning the January 8, 1993 blockade. Similarly, it is apparent that these defendants planned to be in Puerto Rico at the same time to conduct a joint

rescue. Yet as we have already pointed out, this gathering does not amount to a RICO enterprise and the defendants activities in jointly planning to blockade the clinic on January 8, 1993 do not amount to knowing agreement to participate in an enterprise to commit extortion. The existence of an enterprise is a crucial element of both conspiracy and section 1962(c) causes of action which plaintiffs have been unable to demonstrate. Accordingly, the Court finds that plaintiffs have not demonstrated a likelihood of success on the merits with respect to their RICO conspiracy claim.

**C. The "Hindrance Clause" of 42 U.S.C. § 1985(3)**

The hindrance clause of 42 U.S.C. § 1985(3) reads in pertinent part:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, ... for the purpose of preventing or hindering the constituted authorities ... from giving or securing to all persons ... the equal protection of the laws ... the party *so* injured or deprived may have an action for the recovery of damages ...

42 U.S.C. § 1985(3) (1981). In *Bray v. Alexandria Women's Health Clinic*, — U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), the Supreme Court addressed section 1985(3)'s "deprivation clause" in the context of clinic blockades. As the Court noted, the complaint in *Bray* did not set forth a claim under the "hindrance clause." *Bray*, — U.S. at ——–——, 113 S.Ct. at 764–65; nor was the "hindrance clause" issue considered by the lower courts or included in the questions on which the petitioner sought certiorari. *Id.* Thus, as plaintiffs correctly point out, *Bray* leaves open two critical issues con-

actions charged to CCND are providing transportation to a number of demonstrations and a meeting place for the Pro–Life Rescue Team. These activities lack the necessary element of direction and in themselves are an insufficient basis for concluding that CCND participated in the operation and management of the alleged enterprise's affairs. CCND's vans are routinely used by Redemptorists Priests for various reasons without Father Moley's express knowledge or consent. Similarly, the school's facilities

serve as a meeting place to several community organizations, whose activities are unrelated to the school itself or Father Moley. Again, these activities may be characterized as "aiding and abetting," but such conduct falls outside of the perimeter of liability established by the Supreme Court in *Reves*. Accordingly, the Court also finds that plaintiffs' fail to demonstrate a likelihood of success in proving actionable conduct on the part of defendants Moley, Weslin, Martin, Treshman, Sanchez and CCND.

cerning section 1985(3)'s "hindrance clause": whether class-based animus is required under this clause; and whether the clause protects rights guaranteed against official, as opposed to private encroachment.

However, even under the pre-*Bray* legal regime, one admittedly more favorable to plaintiffs, the "hindrance clause" claim before the Court would not likely succeed on the merits. We explain. Assuming a state of affairs where the *Bray* decision does not control analysis of "hindrance clause" claims, plaintiff could recover on this claim by proving the existence of (1) a conspiracy, (2) for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws, and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his or property or deprived of any right or privilege of a citizen of the United States. *Cf., United Bhd. of Carpenters and Joiners v. Scott*, 463 U.S. 825, 828–829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983). Assuming, still further, that the record discloses the existence of a conspiracy, conspiratorial acts and some form of injury, that is, the first, third and fourth elements of a "hindrance clause" claim, then plaintiff only would need to establish that the purpose of the conspiracy was to hinder or prevent law enforcement officers from securing to women their right to seek an abortion. However, it is precisely evidence of this intent to impede law enforcement which is lacking in the record.

Plaintiffs contend that "[i]f defendants did not intend to hinder law enforcement, they would either follow police instructions to remove themselves from clinic premises or attempt to escape when police arrive while they are trespassing. Instead, defendants purposefully get arrested." Plaintiffs also point to defendants' tactic of "going limp" when arrested as further evidence of their intent to hinder law enforcement. Defendant Weslin testified that the tactic of "going limp" was a symbolic gesture meant to underscore the helplessness of unborn children in hands of a society whose legal regime supports a women's right to seek abortions. Thus, the protester becomes the unborn child, as it were, the police officer assumes the role of the state enforcing its laws, and the removal or arrest of the protester parallels the act of abortion. Defendant Weslin also testified that he recognizes that it takes police a longer time to remove helpless people. However, he characterized this as an incidental effect which "buys time" for unborn babies.

In *Bray*, the majority criticized the dissent for finding a purpose to hinder or prevent law enforcement from the District Court's observation that "the rescuers outnumbered the ... police officers" and that "the police were unable to prevent the closing of the clinic for more than six (6) hours." —— U.S. at ——, 113 S.Ct. at 767. The majority described this finding as rendering "utterly meaningless" the distinction between purpose and effect. *Id.*

Plaintiffs argument is similarly flawed. Defendants repeatedly testified that their avowed purpose in conducting "rescues" is to "stop the killing of babies." It is also clear from their testimony that they are unconcerned with some of the side-effects or consequences of their actions, such as whether clinics are unable to pay their employees or whether police efforts to remove them are slowed. Nevertheless, an objective consideration of the record reveals that defendants intention is to prevent what they perceive as the "killing of babies" through abortion. If a conspiracy exists, it is to prevent the practice of abortion and not ultimately to impede law enforcement. Indeed, when asked if the purpose of a particular blockade was to close down the abortion practice of the targeted clinic, Father Welch responded that to him saving the lives of babies and stopping abortion are one and the same thing. He went on to say however, that there are other practices offered at the clinic that he has no interest in closing down. (Tr. 478). Thus, the Court finds that plaintiffs "hindrance clause" claim is unlikely to succeed on the merits because the fully developed factual record does not disclose the existence of a conspiracy aimed at hindering or preventing the constituted authorities in Puerto Rico

from securing to women their right to seek abortions.

The Court reaches this conclusion indulging certain assumptions which favor plaintiffs' position. However, if we remove these assumptions, then the likelihood of a cause of action under the "hindrance clause" succeeding on the merits is even more remote. We explain. Initially, the Court assumed a pre-*Bray* legal environment. However, there are indicators within the *Bray* decision which suggest that the majority would find the same intent requirements in the "hindrance clause" as they found in the "deprivation clause." For example, the majority opinion suggests that a cause of action under the "hindrance clause" would seem to require a showing of "class-based, invidiously discriminatory animus." *Bray,* —— U.S. at ——, 113 S.Ct. at 765. Similarly, the dissent is criticized for arguing that a cause of action under the "hindrance clause" may be maintained as to rights guaranteed against official, as opposed to private encroachment. Thus, in chiding the dissenting justices for considering the "hindrance clause" claim, the majority sent a clear message of their own, namely, that there may be no statutory basis for construing the "deprivation" and "hindrance" clauses differently. Although this message was conveyed *in dictum,* it serves as an indicator of the present leanings of the Supreme Court and, therefore, carries persuasive authority within the context of this controversy. Therefore, the Court would not lack a basis for requiring that, in addition to the four initial factors considered previously, plaintiffs establish "invidiously discriminatory, class-based animus" and that the right involved is guaranteed against private, as well as official, encroachment. Under this more stringent standard, plaintiffs' "hindrance clause" claims would still fail for the same reasons as their "deprivation clause" claim. *See, supra,* note 6. Thus, the Court finds that plaintiffs' have failed to demonstrate a likelihood of success on the merits on their "hindrance clause" claim.

## D. *Public Interest*

The Court having concluded that plaintiffs have failed to show the requisite likelihood of success on the merits on their Ku Klux Klan Act and RICO claims, briefly notes that plaintiffs also failed to show that the injunction will serve the public interest. On February 3, 1993, a bill to assure freedom of access to abortion clinics was presented in the House of Representatives. *See,* H.R. 796, 103rd Cong., 1st Sess. (1993). The bill provides for private civil actions and makes available to plaintiffs a panoply of remedies, including treble damages (such damages may include an award for pain and suffering and emotional distress), appropriate declaratory or injunctive relief, and attorney's fees and costs. A similar bill was introduced in the Senate on March 23, 1993. *See,* S. 636, 103rd Cong., 1st Sess. (1993). The very fact that such bills have been presented suggests that Congress has recognized the limitations of existing federal legislation in dealing with this problem. More importantly, however, the fact that these bills are presently under consideration by Congress indicates that issues raised by cases like the one at bar are being addressed by the nation's legislative body. A legislative response to these issues would take account of the public's interest in this controversy far more effectively than a judicially imposed solution. The Court does not believe that it would best serve the public interest to issue a preliminary injunction at this time because whatever decision the Court entered at this time could be substantially modified by passage of either bill and because the public interest is best served by congressional fact-finding and action on this problem. Accordingly, the Court finds that plaintiffs have not shown that a preliminary injunction issued by this Court in the face of pending legislation aimed specifically at the problems addressed by this lawsuit would promote the public interest.

Thus, because plaintiffs have not shown a probability of success on the merits with respect to any of their federal claims and have not demonstrated that issuance of a preliminary injunction at this time would serve the public interest, the Court hereby denies plaintiffs' request for a preliminary injunction.

## V.

### MOTIONS TO DISMISS

Having concluded that plaintiffs have failed to present evidence warranting the imposition of injunctive relief, the Court turns to the various motions to dismiss plaintiff's cause of action for failure to state a claim upon which relief can be granted.

Presently before the Court are various motions to dismiss submitted both before and after the preliminary injunction hearing: (1) Defendants Welch and Weslin, "Motion to Dismiss and/or Summary Judgment and Memorandum of Law in Support Thereof," docket no. 15, filed 2–1–93; (2) Defendants Moley and CCND, "Motion to Dismiss," docket no. 21, filed 2–2–93; (3) Defendants Moley and CCND, "Motion to Dismiss," docket no. 57, filed 4–6–93; (4) Defendant Sanchez, "Motion to Dismiss," docket no. 67, filed 6–6–93.

 The Court notes that in this case, the preliminary injunction hearing was not consolidated with the trial on the merits. Fed.R.Civ.P. 65(a)(2). Nonetheless, there are certain situations where a final adjudication, following a preliminary injunction hearing, is appropriate. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2950, at 490 (1973). When it appears, for example, that the complaint is insufficient on its face, courts may dismiss the entire action after a preliminary injunction hearing. *Id.; Communications Maintenance, Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1206 (7th Cir.1985); *Standard Oil Co. of Texas v. Lopeno Gas Co.,* 240 F.2d 504, 510 (5th Cir.1957); *Kershaw v. Federal Land Bank of Louisville,* 556 F.Supp. 693 (M.D.Tenn.1983). Plaintiffs in this case have had the benefit of a four day hearing at which the testimony of 11 witnesses was heard and extensive exhibits were received in evidence. From the Court's review of the law applicable to plaintiffs' request for a preliminary injunction, it has become clear that plaintiffs have not demonstrated a reasonable likelihood that they will prevail on the merits. Because the Court has considered material outside of the pleadings, it would be inappropriate, at this juncture, to rule on the motions to dismiss as

such. Several important findings have emerged from our consideration of the record. First, there are no real material disputes as to the facts of the case. The planning for the blockades, the tactics, the attendance, the players, all of this was well documented on the record and essentially uncontested by defendants. Defendants presented defenses by way of explaining their actions, but for the most part they did not contest the occurrence of material events. Second, plaintiffs have conducted extensive discovery. (*See,* docket nos. 6, 8, 12, 13, 17, 51, and 61). It does not appear that added discovery in this case will substantially assist plaintiffs. The difficulty for plaintiffs in this case is not the absence of proof. What has brought the Court to its conclusion that plaintiffs' will not likely succeed on the merits is quite simply the state of the law. The Supreme Court in *Bray* has all but removed the Ku Klux Klan Act as a viable cause of action in blockade cases. Likewise, in *Reves,* the Supreme Court set forth a higher standard of actionable conduct for RICO cases. Even if plaintiffs had come forward with much stronger evidence of conduct, enterprise and pattern, the Court would have been forced to consider whether plaintiffs could prove extortionate activity, which would have implicated *Scheidler,* and caused us to hold our decision in abeyance. Thus, there is very little that plaintiffs could have done to prevail on the application for a preliminary injunction. The same would have been true had the Court been deciding a motion for summary judgment. Thus, the Court sees no reason to postpone the inevitable.

Based on our finding that this controversy presents no genuine factual disputes, and our determination that defendants are entitled to judgment as a matter of law, the Court determines that there is no more information that would affect this decision. Before entering summary judgment *sua sponte,* however, the Court shall put plaintiffs on notice and afford them an opportunity to show cause as to why summary judgment shall not be entered in favor of the defendants. *Stella v. Town of Tewksbury,* 4 F.3d 53 (1st Cir.1993). The Court notes, however, that the motion to dismiss filed by defendants Moley and Colegio Catolico (*See,* docket no. 57) and plain-

tiff's opposition thereto (*See,* docket no. 62) both make extensive reference to the testimony and evidence included in the transcript of the hearing. Nevertheless the Court shall afford plaintiffs an opportunity to respond.

## VI.

## PENDENT STATE LAW CLAIMS

■ The exercise of supplemental jurisdiction over state-law claims is a matter purely within the discretion of the trial court. However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Therefore, should the Court enter summary judgment for the defendant on the federal claims in this case, the pendent claims shall be dismissed without prejudice for want of jurisdiction. *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990).

## VII.

## CONCLUSION

The Court hereby denies plaintiffs' request for a preliminary injunction. Moreover, there being no genuine material disputes as to the facts of this controversy and defendants being entitled to judgment as a matter of law, the Court hereby grants the plaintiffs until November 16, 1993 to show cause as to why the Court should not enter summary judgment for the defendants on the federal claims and dismiss the pendent state law claims without prejudice.

**IT IS SO ORDERED.**